[Crim. No. 232.   Third Appellate District.—June 13, 1914.]

THE PEOPLE, Respondent, v. J. P. BOWMAN, Appellant.

CRIMINAL LAW—OBTAINING NOTE UNDER FALSE PRETENSES—INSUFFICIENCY OF VERDICT.—In a prosecution for procuring the execution of a promissory note by means of false pretenses, a verdict which finds "the defendant guilty of obtaining the signature of G. on a certain promissory note under false pretenses but with no intention to defraud said G. of the amount," is insufficient to sustain a judgment of conviction.

ID.—REJECTION BY COURT OF INSUFFICIENT VERDICT—DELIVERY OF SECOND VERDICT BY JURY.—But if such verdict is rejected by the court, whereupon the jury deliver another verdict which they agreed upon at the same time as the first verdict, the second verdict, if otherwise sufficient, will support the judgment.

ID.—WHAT CONSTITUTES FALSE PRETENSES—INTENTION OF DEFENDANT. If the defendant knowingly made false representations, with the intention of obtaining such note, and he thereby did obtain the note to the prejudice of the prosecuting witness, he committed the crime, whatever might have been his intention as to his repayment of the money. The fraudulent intent contemplated by section 532 of the Penal Code is the intent, by means of the false representations, to secure the property which is sought by the party charged.

ID.—FALSE PRETENSES—SUFFICIENCY OF EVIDENCE TO SUPPORT CONVICTION.—In this prosecution for procuring the execution of a

promissory note through misrepresentations by the defendant that
he owned and was in possession of certain valuable bonds, the
evidence is sufficient to support the inference that he had no such
bonds and that his false representations were an inducement to the
execution of the note.

ID.—PROMISE AS TO FUTURE EVENT—EVIDENCE.—The fact that the de-
fendant said he would send the bonds to Chicago and have the
money in two or three weeks to take up the note, does not con-
clusively show that the note was signed under a promise to do
something relating to a future event.    There was present a false
statement to which was added the false promise—a false statement
by the defendant that he had the bonds, to which he added the
false promise that he would have them cashed, a promise impossible
of fulfillment because he had no bonds.    Such a concurrent promise
does not overcome the force of the false pretense.

ID.—INSTRUCTIONS—SUFFICIENCY WHEN CONSIDERED AS WHOLE.—In a
prosecution for obtaining the execution of a promissory note by
false pretenses, instructions, or parts of instructions, which, stand-
ing alone are erroneous, may, when considered with the entire
charge, be free from prejudicial error.

ID.—SUFFICIENCY OF EVIDENCE—REASONABLE DOUBT—INSTRUCTIONS.—
In such prosecution error cannot be predicated of an instruction to
the jury "that it is not necessary that the prosecuting witness, G.,
should expressly testify that the false pretenses induced him to act
as he did.    If you are fully satisfied beyond a reasonable doubt
from·the testimony of other witnesses in the case and from all
the facts and circumstances in the case that the pretense induced
the prosecuting witness to part with his property to defendant, that
is sufficient to that extent."

ID.—INTENTION OF DEFENDANT—INSTRUCTIONS NOT ERRONEOUS.—Nor
can error in such case be predicated of the following charge to the
jury: "You are instructed that when the pretense made by the
defendant is false, and known to be so by him, it is no defense that
the defendant intended or expected to pay for the property ob-
tained when he was able to do so; and it is no defense that defend-
ant B. himself received no money personally from the promissory
note that he obtained from G. if you believe beyond a reasonable
doubt that B. intended to and did defraud G. of same by the use
and means of the false pretenses."

ID.—FRAUD AND DECEPTION—INSTRUCTIONS REGARDING.—A charge to
the jury in such case that "you are instructed that deception de-
liberately practiced for the purpose of securing an unfair advantage
of another is fraud.    Property obtained by such practice is ob-
tained by fraud.    A person deprived of his property by such
means is defrauded," if erroneous, is not prejudicial.    While it does

not answer the requirement of section 532 of the Penal Code, other instructions in the case do so fully.

ID.—ARGUMENT OF SPECIAL PROSECUTOR—MISCONDUCT.—It was misconduct on the part of the special prosecutor in this case to state in his address to the jury: "I know that B. is guilty of this crime, I know that he has defrauded a brother Mason, done it fraudulently and intentionally. And his brother Mason, G., has lost nineteen hundred dollars on this account." And again: "When a man breaks a law against his brother in the lodge—ah, gentlemen, does not that add something to it too? Does not that add cruelty to crime?" But in view of the evidence in the case bearing upon the defendant's guilt, and upon an examination of the entire record, it cannot be said that this misconduct has brought about a miscarriage of justice.

ID.—REPORTER'S NOTES—EXPLANATION AS TO CHANGE OR CORRECTION.— The trial court has the right to accept the reporter's explanation and other facts tending to sustain her statement that she made a mistake in her notes, taken at the preliminary examination, which she corrected when transcribing them, and that there was no intention to change the testimony as given nor in fact any change.

APPEAL from a judgment of the Superior Court of Del Norte County and from an order refusing a new trial. John L. Childs, Judge.

The facts are stated in the opinion of the court.

Gillett & Cutler, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

THE COURT.—A rehearing was granted that we might give consideration to an alleged special verdict that now appears in the corrected transcript but which was not before us at the former hearing. In relation to the said verdict the account presented by the record is as follows: "The jury returned into court. Judge Childs: Have you reached a verdict, gentlemen? Foreman: We have two verdicts and if the one is not legal we have another. The Court: You will pass it over. The foreman passed to the court a document which read as follows: 'We the jury find the defendant guilty of obtaining the signature of N. Giacomini on a certain promissory note under false pretenses but with no intention to

defraud said N. Giacomini of the amount.   Wm. McAdoo, Foreman.'   The Court: This does not find him guilty of anything.   Foreman: Then we have this verdict: 'We the jury find the defendant guilty of the crime charged and leave to the mercy of the court.'   The jury was then polled.''

Appellant claims that the first of the foregoing constituted a special verdict within the contemplation of the following sections of the Penal Code: ''The jury when they are in doubt as to the legal effect of the facts proved, may find a special verdict.''   (Sec. 1150.)   ''A special verdict is that by which the jury find the facts only, leaving the judgment to the court.''   (Sec. 1152.)   ''The special verdict must be reduced to writing by the jury, or in their presence entered upon the minutes of the court, read to the jury and agreed to by them, before they are discharged.''   (Sec. 1153.)   ''A special verdict need not be in any particular form, but is sufficient if it present intelligently the facts found by the jury.''   (Sec. 1154.)

It is argued by appellant that ''This verdict contained all of the facts necessary to be found in an action for obtaining money or property by false pretenses.   In such an action two material facts must appear—namely: false and fraudulent representations or pretenses whereby one defrauds another person of money, labor or property and that there was an intent at the time to defraud.   This verdict finds the fact that the defendant obtained the signature of N. Giacomini to a promissory note under false pretenses and it also further finds that the defendant had no intention to defraud N. Giacomini.''

The foregoing is not altogether accurate and contains only a partial truth, as an analysis of the information and of said verdict will clearly demonstrate.   In the information it appears that by false representations the defendant induced said Giacomini to perform two separate acts,—namely, to execute or sign the note and to deliver it to said Bowman. It is manifest that if either one of these was superinduced by said fraudulent pretenses and thus appellant was enabled to obtain possession of said note to the prejudice of Giacomini the offense would be complete.   It might be true that the signature was obtained without fraud but if the delivery was caused by false representations a verdict of guilty might follow.   Thus it appears that no judgment could be based upon

the mere finding of the jury that the signature was obtained without any intention to defraud, because it leaves undetermined the character of the other vital element, the delivery of possession of the note.

The latter part of section 1152 of the Penal Code adds a degree of certainty to what is implied in the first sentence of said section. It is that the special verdict "must present the conclusions of fact as established by the evidence . . . and these conclusions of fact must be so presented as that nothing remains to the court but to draw conclusions of law upon them." If the finding of fact be consistent with either a verdict of guilty or of not guilty, as it was in this case, it is apparent that it does not constitute a special verdict as that term is used in the statute. In other words, if the finding does not embrace all the material facts charged in the information it is not sufficient of itself to support any judgment and no conclusion of law can be by the court based thereupon.

If the fraud, as alleged in the information, related only to the act of securing the signature of Giacomini, or if it was averred that by means of these false and fraudulent statements defendant had *obtained* the note and the jury had found that he *obtained* it without any intention to defraud—in either of these contingencies, of course, the case would be different.

But the so-called special verdict is radically defective in another respect. The jury found—not that Bowman had no intention to defraud Giacomini, or that he did not *knowingly* make the false statements—but that he had no intention to defraud the latter "of the amount." While the expression is not very clear, the jury probably meant that Bowman had no intention of defrauding Giacomini of the amount of money that the latter might be called upon to pay by reason of the note. But Bowman, at the time he secured the signature of Giacomini, might fully have intended to pay the note himself and to save Giacomini harmless and yet this would not affect a single element of the crime. If defendant made the said false representations knowingly and with the intention of obtaining said note and he did thereby obtain the note to the prejudice of Giacomini he committed the crime whatever might have been his intentions as to his repayment of the money. The fraudulent *intent* contemplated by section 532

24 Cal. App.—50

of the Penal Code is the *intent*, by means of the false representations, to secure the property which is sought by the party charged.

Manifestly no defense would be found in the claim that he fully intended at the time to make the aggrieved party whole, if a defendant, by means of false representations, knowingly secures the promissory note of another and thereby obtains credit to the prejudice of the maker.

In *People* v. *Wieger*, 100 Cal. 356, [34 Pac. 827], it is said: "In the assumption that it must be held that defendant did not intend to defraud the Sharpless firm, if he intended at the time to pay for the goods according to the contract of sale, and truly believed that he was able to do so, I think counsel is in error. Deception deliberately practiced for the purpose of gaining an unfair advantage of another is fraud. Goods obtained by such practice are obtained by fraud. One deprived of his property by such means is defrauded," and among the cases cited by Judge Temple is *Commonwealth* v. *Coe*, 115 Mass. 481, wherein it is said: "The intent to defraud is the intent by the use of such false means to induce another to part with his possession and confide it to defendant when he would not otherwise have done so. Neither the promise to pay, nor the intention to do so, will deprive the false and fraudulent act in obtaining it of its criminality."

One is defrauded of his property "when he is induced to part with it by reason of the false or fraudulent pretenses and representations and the offense is complete when by means of such false pretenses the fraud thereby intended is consummated by obtaining possession of the property sought." (*People* v. *Bryant*, 119 Cal. 597, [51 Pac. 961].) "If the false pretense was among the means by which he obtains the valuable thing, he has committed the full crime the same as though no other influence combined therewith." (2 Bishop on Criminal Law, 424.)

From the foregoing it follows that if the jury in said verdict had found specifically that the defendant was guilty as charged in the information it might have been properly entered as a verdict of conviction notwithstanding the concluding clause. Under the decisions, however, it must be held that the finding: "Guilty of obtaining the signature of N. Giacomini on a certain promissory note under false pre-

tenses," is not a sufficiently certain and definite response to
the general issue to meet the requirement of the law.

In *People* v. *Small*, 1 Cal. App. 320, [82 Pac. 87], the de-
fendant was charged with defrauding a person of one hun-
dred dollars in money and it was held that a verdict finding
the defendant "guilty of the crime of felony, to wit, obtain-
ing money by false pretenses," was insufficient to support
a judgment of conviction.    Therein are cited *People* v. *Cum-
mings*, 117 Cal. 497, [49 Pac. 476], and *People* v. *Tilley*, 135
Cal. 62, [67 Pac. 42].    In the former the defendant was
charged with obtaining the promissory note of C. Schnelle
for the value of one hundred and seventy-five dollars by cer-
tain false and fraudulent pretenses and the verdict found
that "the defendant is guilty of defrauding C. Schnelle of
the note of one hundred and seventy-five dollars in the in-
dictment mentioned."    The verdict was held to be insuffi-
cient for the reason that it did not find as to the false and
fraudulent representations alleged in the indictment.

In the Tilley case the verdict was: "We the jury in the
above-entitled case, find the defendant, Chas. H. Tilley, guilty
of receiving stolen property."    It was held insufficient, prin-
cipally for the reason that it did not appear in said verdict
that he had *knowledge* that the property was stolen.    So, in
the said verdict here, in addition to other objections, there
is no finding that the false pretenses were knowingly made
and the said verdict is uncertain as to *what were* the false
pretenses and the note is not identified as the one set out in
the information.

Notwithstanding the foregoing infirmities, if said verdict
had been legally declared and entered it would have been
binding upon the court and defendant would have been en-
titled to his discharge. (*People* v. *Small*, 1 Cal. App. 320,
[82 Pac. 87].)    The judge, however, seasonably recognized
the insufficiency of the said verdict and made the declaration
as aforesaid.

The said verdict having been neither general nor special,
the duty of the court is prescribed in section 1161 of the
Penal Code as follows: "If the jury render a verdict which
is neither general nor special, the court may direct them to
reconsider it, and it cannot be recorded until it is rendered
in some form from which it can be clearly understood that

the intent of the jury is either to render a general verdict
or to find the facts specially and to leave the judgment to
the court.'' It seems, though, that the jury had anticipated
the action of the court and had already agreed upon another
verdict proper in form, and which they immediately declared
to be their true verdict. Of course, it was not necessary for
the jury to retire again to reconsider their verdict, since they
had already accomplished the purpose of such reconsideration.
It is equally apparent that the defendant was not prejudiced
by the peculiar phraseology of the said remark of the trial
judge. It is as plain as anything can be that the only effect
of said remark upon the jury was to confirm them in their
apprehension or belief that the first verdict was insufficient.
The said statement did not influence the second verdict for
the very obvious reason that it had already been agreed upon.
It follows that as to said proceeding there is nothing of which
appellant can justly complain.

One other point strongly insisted upon by appellant on the
rehearing is that the evidence is insufficient to justify the in-
ference that defendant was not the owner of the bonds and
he criticises the following statement in our former opinion
herein: ''There were no bonds on a Chicago bank or elsewhere
in defendant's box'' and ''he had a deposit box in which he
kept his corporation shares, but it contained no bonds.'' We
are satisfied, however, after a re-examination of the record,
that the foregoing is not only a reasonable but the only ra-
tional inference from the testimony of the witnesses Rice and
Lauff, and we adopt, with slight modification, the views ex-
pressed in the original opinion as follows:

''At the close of the trial defendant moved the court to
advise the jury to acquit defendant, which motion was de-
nied. The point urged that the *corpus delicti* had not been
proven was predicated of a failure to prove the falsity of the
statements made by defendant with regard to the Chicago
bank bonds. It is claimed that it was incumbent on the
prosecution to prove that defendant did not own such bonds,
of which, it is contended, there was no proof—citing *People*
v. *Simonsen,* 107 Cal. 345, [40 Pac. 440] ; that the ruling on
defendant's motion 'clearly involved the whole merits of
the case, which included proof of the *corpus delicti.*' *People*
v. *Ward,* 145 Cal. 736, [79 Pac. 448], is cited, where it was

said: 'The elements of this crime necessary to the establishment of the *corpus delicti* are false statements adapted to the fraudulent purpose, and money parted with upon the faith of such statements.' And it was further said: 'In this case there was no substantial evidence of the falsity of the statements alleged to have been made by the defendant aside from the testimony of witnesses as to his admissions.'

"The principle of the two cases cited is the same—that the extrajudicial statements and admissions of the defendant are not alone sufficient. In the present case the implied findings of the jury do not rest upon the admissions of defendant as testified to by witnesses. The findings rest upon the false statements made to Giacomini by defendant as an inducement for the delivery to him of said note.

"Defendant was engaged in selling drugs, his store being in Crescent City. Giacomini was a man of advanced years and was engaged in farming some miles in the country. They were friends and on previous occasions Giacomini had assisted defendant financially in a small way. On July 28 or 29, 1912, defendant, being in earnest need of money for immediate use, went to his old friend at his farm to obtain relief. What occurred there was in the presence of Giacomini, his wife, his son, and a farm hand and was testified to by them.

"The testimony was that Giacomini, when first requested to sign the note, refused to do so; defendant urged upon him the importance of his signing so that he could get the money the next day on the note and, to aid him in his attempt to persuade Giacomini to sign, defendant called Mrs. Giacomini out of their house and urged her to have her husband execute the note; she promptly refused and said he must not sign; that they were old; their farm mortgaged; that their son was not in good health and had a large family and positively refused to consent. 'Q. What did Mr. Bowman say then? A. He told me to let him sign that note, that he had to have the money at Hegler's Bank, and that he had bonds that he got from Chicago that was worth three thousand eight hundred dollars. Q. What did he say that he had? A. Bonds that were worth three thousand eight hundred dollars. He said that Hegler said that he would not accept the bonds, and that he had to have some money there at the

bank. And I said that it is funny that he won't accept them. I said it is funny that Mr. Hegler won't, do it if you have got them bonds there and they are good. It is funny to me. Q. What else did you say to Mr. Bowman about the bonds? A. He said that Hegler won't cash, or accept them bonds for cash. He said that they had to be sent back to Chicago to get them cashed. And I said, that it is funny if them bonds are good that he won't cash them, and he said that Hegler didn't know much about the bank business. Q. Mrs. Giacomini, did Mr. Bowman say to you, or in your presence anything about whose bonds those were? A. Yes, he said that they were his own bonds he had deposited there at Hegler's Bank, and that it was more than three thousand eight hundred dollars, and that when he got the money back from Chicago it would pay the note. Then he said when the money was back that my husband would be out of the note. Then I said, No again, that I don't want him to have anything to do with it. Q. When you speak of Mr. Hegler's Bank what bank do you mean? A. The Crescent City Bank. Q. What Hegler is it? A. We always call it Hegler's Bank. . . . Q. After that did your husband sign the note?. A. He made him believe that there was going to be no trouble and my husband signed the note. Q. What did your husband do with it? A. Then he handed it to Mr. Bowman. Q. To this man here (pointing to defendant)? A. Yes. Q. You saw that with your own eyes? A. Yes. Then he saw that I was mad. Because I didn't want to let him sign the note and Bowman said, "Don't be afraid; I tell you another thing, Mrs. Giacomini," he says, "if anything should happen inside of those two weeks until the money is back I will give you security in the drug store." Q. That was after the note was given? A. Yes, after the note was given, because I kicked against it all the time to sign the note.'

"Giacomini testified that he was induced to sign the note by defendant's representations, that he had in the Crescent City Bank bonds of a Chicago bank of the cash value of three thousand eight hundred dollars; that he 'depended on the bonds'; that after he had signed and delivered the note defendant said that he had shares in a drug store that he would give him as security.

"There was, we think, sufficient evidence to support the implied finding of the jury that defendant procured the note by means of the representation that he had at the time in the Crescent City Bank Chicago bank bonds of the cash value of three thousand eight hundred dollars and that the offered shares in defendant's drug store formed no part of the inducing cause to sign the note. Giacomini testified: 'Q. Did you believe the story that he told you about the Chicago bank bonds? A. That is the reason that I signed my name to the note because I believed him. I believed that he had the bonds. . . . Q. Do you remember whether Mr. Bowman said anything about O. B. Lauff going on the note? A. He mentioned Mr. Lauff and another man, but I didn't think of anything but the Chicago bonds; that is what I depended upon. . . . Q. Did you sign the note because Mr. Lauff was going on it? A. No.' Lauff did in fact sign the note and after Giacomini had paid it secured him to the extent of one-half its face. Defendant took the note to S. W. Rice, county treasurer, with whom defendant had some unexplained relation affecting the county funds. Rice delivered the note to Gamboni, the payee, who indorsed a certificate of deposit on the Crescent City Bank for the amount of the note and gave it to Rice who cashed it and paid the money into the county treasury. Defendant was not permitted to show that this was a transaction to make good the money improperly loaned by Rice from the county treasury, the court correctly holding that it furnished no defense for having obtained the note from Giacomini who knew nothing of defendant's financial relations with Rice. Indeed, defendant's representation was that he needed the money to pay to the bank. Rice testified that when defendant handed him the note he did not tell him 'how he came to get it; nor did he say anything about his promising to give Giacomini stock in his drug store as security. He gave me a key to his deposit box and told me to take bonds or stock or something out of it and give it to Mr. Giacomini when he called for it, but the nature of it I didn't know.' He testified that he took the package out of defendant's box and secured a box in Lauff's name, deposited the package in the box and gave him the two keys and this ended Rice's connection with the matter. A week or more later Giacomini received one of the keys from Lauff. The package referred

to was shares in a corporation formed by defendant to carry on the business of selling drugs and other merchandise. This package of shares remained in the box and was produced at the trial by Lauff. There were no bonds of a bank in Chicago or elsewhere in defendant's box. Mr. Hegler, cashier of the Crescent City Bank, testified that defendant left with him no bonds; that he had never spoken to him about cashing any bonds and he 'didn't know he had any,' and did not know that he ever had any bonds in the bank on deposit, but what he had in his deposit box he did not know.

"There was evidence that defendant formed a corporation, in February, 1912, with a capital stock of $15,000 divided into 150 shares of the par value of $100 each, 98 shares of which were issued to defendant and one share each to two other persons to qualify them as directors; that the object of the corporation was to carry on the drug business and probably it was defendant's intention to transfer his stock of drugs to this corporation. Mr. Parsons, secretary of the corporation, testified that it was the understanding that these shares were 'in payment for the drug store and the merchandise in it which he (defendant) then owned and which the corporation was then taking over.' There was no evidence other than this that there had been any transfer of the stock of drugs to the corporation or that the shares had any value; there was no evidence that it had transacted any business, other than to issue these shares, or that the drug store was thereafter conducted by the corporation. It was shown by the certificate of the secretary of state that the charter of the corporation was declared forfeited, November 30, 1912, for nonpayment of license-tax for the fiscal year ending June 30, 1913. An inventory of defendant's stock of goods was taken for his creditors, in December, 1912, showing a value of about $5,000, but whether these were creditors of the corporation or of defendant individually does not appear. This evidence as to these corporation shares and defendant's offer to give them to Giacomini as security was introduced as tending to rebut any evidence of an intention to cheat him. It is urged that defendant's offer to turn over his corporation shares as security is inconsistent with any intention to cheat or defraud his friend. Assum-

ing that these shares in fact had some value, which is not shown, the placing of them in the hands of Giacomini and Lauff would tend in some degree to negative evidence of fraudulent intent in the transaction and thus eliminate one of the elements necessary to constitute the crime involved. But the question of fraudulent intent was with the jury and was to be determined from all the circumstances in the case. The turning over of these shares as security after he had secured the note signed by Giacomini was not conclusive of the question of intent when he made the representations which induced Giacomini to sign and deliver the note.

"Nor does it seem to us that there was a failure to establish the falsity of the representations on which Giacomini acted. It is true there is no direct evidence that defendant did not own and have in the bank at Crescent City the bonds he claimed to have there. It was shown that the cashier of the bank had no knowledge of his having any bonds there. He had a deposit box in which he kept his corporation shares but it contained no bonds. He represented that the cashier had refused to cash them, from which it must be inferred that, if true, the cashier had some knowledge of them. But he testified that he had none. There was left then no source of proof to the prosecution but to examine the officers of every bank in Chicago. In establishing a negative, do the rules of law require more than was here shown? We think not. It is not always possible—indeed, it is generally impossible to prove an absolute negative and such proof as is available is generally circumstantial and inferential. Defendant did not testify nor did he offer any evidence tending to show that he ever owned the bonds or any bonds such as represented by him. Upon this point see 1 Wharton on Criminal Evidence, 10th ed., pp. 693, 694; 2 Wharton's Criminal Law, 11th ed., pp. 1615 and 1631. We have no hesitancy in holding that the proofs submitted by the prosecution were sufficient to support the inference that defendant had no such bonds.

"Defendant cites 19 Cyc. 395; *Commonwealth* v. *Stevenson,* 127 Mass. 446; *Cook* v. *State,* 71 Neb. 243, [98 N. W. 810], to the proposition that 'a mere promise to do something, relating as it does to a future event, is not within the stat-

ute.' The proposition as stated may be conceded to be the rule. Defendant claims that Giacomini 'signed the note upon the promise made by the defendant that he would get some money in Chicago upon some bonds which he owned and in two or three weeks he would be able to pay it.' The evidence, in our opinion, when fully considered, justified the inference that the persuading fact inducing Giacomini to sign the note was his belief, founded on defendant's representations, that he had in his possession these valuable bonds sufficient to convince him that he would not lose by accommodating defendant. The evidence shows that Giacomini's relations with defendant were of so friendly a character as would justify him in believing that there was no risk so long as defendant had bonds capable of being turned into cash. The fact that defendant said he would send them to Chicago and that he would have the money in two or three weeks to take up the note does not conclusively show that the note was signed under a promise to do something relating to a future event. The jury were justified, from all the evidence before them, in finding that Giacomini's reliance, as a moving cause for signing the note, rested on the representation that defendant had these bonds in his possession. In the case here there was a false statement, as found by the jury, to which was added the false promise—a false statement by defendant that he had the bonds, to which he added the false promise that he would have them cashed, a promise impossible of fulfillment because he had no bonds. Such a concurrent promise does not overcome the force of the false pretense. (2 Wharton on Criminal Law, 11th ed., sec. 1438; *State* v. *Briggs,* 7 L. R. A. (N. S.) note at p. 278.)

"It is urged that the court erred in admitting the certified copy of Compiled Statements of Domestic Corporations showing that, on November 30, 1912, the charter of the Bowman Pharmacy, the corporation above referred, to had been forfeited for nonpayment of a license-tax; that this evidence was offered to show that the shares of the corporation were valueless and was error because 'it bore directly upon the question of the intent of defendant in securing the complaining witness's signature to the promissory note he was afterwards compelled to pay.' It is true that the forfeiture declared by the secretary of state, under the statute, did not

have the effect to destroy the assets of the corporation or deprive the stockholders of their interest in such assets; it went no farther than to prevent the corporation from transacting business in the state. The directors, however, still retained the power, as we understand the statute, to settle the affairs of the corporation. It seems to us that, conceding error, it was without prejudice for the reason that there is no evidence that the corporation owned the drug store theretofore carried on by defendant, or that it owned any property or that the shares had any value.

"Witness Parsons, secretary of the corporation, was called by the prosecution and, over defendant's objection, was permitted to testify that, some time in June or July, 1912, defendant told witness the corporation 'had fallen through.' The objection was that 'it did not lie in the mouth of any person to dissolve a corporation,' which could be accomplished only by methods pointed out by statute. Defendant made no explanation of what he meant by the rather vague expression, 'fallen through.' For the reasons given respecting the certificate of the secretary of state, we cannot see that the evidence was prejudicial. If the stock had no value, a fact which if true must have been known to defendant, it is not apparent that offering it as security would go very far toward showing that he did not intend to cheat or defraud the person misled by him.

"Error is claimed of the first instruction given by the court for the reason that it states that 'any pretense sufficient to impose upon the person to whom it was made, if made with the intent to cheat or defraud him, if property is obtained thereby from such person, is sufficient.' The point made is that it omits the essential element that the pretense must be false or fraudulent. The first part of the instruction states 'that every person who knowingly and designedly by any false or fraudulent representations or pretenses defrauds any person of property and thereby obtains possession of the property,' etc. Reading the entire instruction as we must to get its meaning, we discover no merit in the point.

"The court gave the following instruction of which error is predicated: 'You are instructed that an intention to defraud is inferable from all the facts of the case and need not be substantially proven.' There is force in the criticism

that 'a fact in criminal law which is not substantially proven is not sufficiently proven. The testimony to prove this intention must be material and substantial and not slight.' If the instruction stood alone and unaided as indicative of the meaning of the court, there might be ground for assuming that it misled the jury into the belief that any degree of proof, however slight, would be sufficient. When read in connection with the instruction which follows the otherwise misleading feature is removed: 'The question of intent to cheat and defraud is one of fact for you to determine from all the evidence in the case. This intention need not be proven by direct and positive evidence, but it may be lawfully and properly inferred by you from all the facts and circumstances in evidence having reference to and bearing upon and tending to prove such intent, provided such evidence is sufficient to satisfy you of such intent beyond a reasonable doubt.'

"Full instructions were given upon the question of reasonable doubt; also as to all the elements entering into the alleged crime and the necessity or proof as to them beyond all reasonable doubt.

"The court instructed the jury as follows: 'You are instructed that it is not necessary that the prosecuting witness, N. Giacomini, should expressly testify that the false pretense induced him to act as he did. If you are fully satisfied beyond a reasonable doubt from the testimony of other witnesses in the case and from all the facts and circumstances in the case that the pretense induced the prosecuting witness to part with his property to defendant, that is sufficient to that extent.'

"It is objected that this is an instruction on a question of fact. The prosecuting witness testified expressly that the false pretense induced him to act as he did. The instruction simply means that this fact was capable of proof by testimony of other witnesses and from all the facts and circumstances in the case, which, we think, might properly be stated to the jury.

"Error is predicated of the following instruction: 'You are instructed that when the pretense made by the defendant is false, and known to be so by him, it is no defense that the

defendant intended or expected to pay for the property ob-
tained when he was able to do so; and it is no defense that
defendant J. P. Bowman himself received no money person-
ally from the promissory note that he obtained from N.
Giacomini if you believe beyond a reasonable doubt that
J. P. Bowman intended to and did defraud N. Giacomini of
same by the use and means of the false pretenses.'

"Defendant claims that the jury were thus told to dis-
regard all testimony concerning the stock of the drug store
and its offer by defendant to the prosecuting witness as
security. We do not think that the jury could have under-
stood from this instruction that they were to disregard any
testimony. They were told many times in the course of the
charge that they were to consider all the facts and circum-
stances. This instruction was designed to meet the phase
of the case which showed that county treasurer Rice received
the money for the note and placed it in the county treasury.
Whether this amount had been borrowed by defendant from
county funds does not clearly appear, but whatever the rea-
son for his turning the note over to Rice the court very prop-
erly told the jury that it was no defense that defendant did
not personally receive the money.

"Complaint is made of the following instruction: 'You
are instructed that deception deliberately practiced for the
purpose of securing an unfair advantage of another is fraud.
Property obtained by such practice is obtained by fraud. A
person deprived of his property by such means is defrauded.'

"It will not, of course, be contended that this instruction
answers the requirement of section 532 of the Penal Code.
Other instructions, however, did this very fully. We can see
no error in this instruction, nor prejudice if it was error.

"We may remark of the instructions that defendant of-
fered 16 carefully prepared and covering the case quite fully
and presumably as favorable to defendant as counsel felt
justified in asking. They were all given with the exception
of an unimportant amendment to one. The instructions
given at request of the people have been examined. We feel
quite convinced that defendant's rights were in no degree
prejudiced by any instructions given and that he had the

benefit of full, clear and correct directions for the guidance of the jury.

"In the course of his address to the jury the special prosecutor stated: 'I know that J. P. Bowman is guilty of this crime. I know that he has defrauded a brother Mason, done it fraudulently and intentionally. And his brother Mason, N. Giacomini, has lost nineteen hundred dollars on this account.' And again: 'When a man breaks a law against his brother in the lodge—ah, gentlemen, does not that add something to it too? Does not that add cruelty to crime?

"It is contended that this was misconduct prejudicial to defendant's rights. There were some other statements not mentioned in defendant's brief to which objection was made at the time. There was no evidence that defendant and Giacomini were brother Masons or belonged to the same lodge of any society. The remarks of the prosecuting attorney were unwarranted and highly reprehensible. It does not appear that any one of the jurors belonged to a masonic or any other lodge. In stating that he knew that the defendant was guilty, the prosecuting attorney said: 'I want to say this, gentlemen, that according to this evidence, I know that J. P. Bowman is guilty,' etc. We do not think this statement presents the question of misconduct in the form condemned by the supreme court in *People* v. *Valliere,* 127 Cal. 65, [59 Pac. 295], where the district attorney, in speaking of another theft, of which evidence was excluded, states what the supreme court considered 'as in the nature of testimony.' In view of the evidence in the case bearing upon defendant's guilt and after an examination of the entire record, we cannot say that this misconduct has brought about a miscarriage of justice. (Const., art. VI, sec. 4½.)

"Complaint is made that the reporter at the trial, in transcribing her notes taken at the preliminary examination, changed them by substituting the word 'on' for 'in' so that the testimony would read 'on a bank in Chicago,' referring to defendant's representation at the time he obtained the note. The matter was gone into at the trial with a view to correct the testimony and have it go to the jury thus corrected. We do not think defendant's claim was sustained. At any rate, the court had the right to accept the reporter's

explanation and other facts tending to sustain her statement that she made a mistake in her notes which she corrected when transcribing them and that there was no intention to change the testimony as given nor in fact any change."

The judgment and order are affirmed.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 12, 1914.