[Cr. A. No. 623.   Appellate Department, Superior Court, Los Angeles County.—June 19, 1931.]

THE PEOPLE, Respondent, v. ANNIE L. CURTISS, Appellant.

(1 Cal. Supp. 146.)

William J. Clark and Eugene J. Wix for Appellant.

Buron Fitts, District Attorney, Tracy Chatfield Becker and Frank W. Stafford, Deputies District Attorney, and A. L. Lawson, City Prosecutor, for Respondent.

YANKWICH, J., *pro tem.*—In a complaint filed in the police court of the city of Glendale, California, on February 25, 1931, the appellant, a teacher in the public schools of that city, and principal of Thomas A. Edison School, was charged with a violation of section 273a of the Penal Code of California. The offense was alleged to have been committed on February 24th, when the defendant, as stated in the complaint, "did wilfully, wrongfully and unlawfully, at the Thomas A. Edison School, 440 South Pacific Ave., in the said City of Glendale, inflict unjustifiable physical pain and suffering on the person of Louis Cortese, a child of the age of 7 years".

She was tried by a magistrate, without a jury, and by him found guilty on March 9, 1931. A motion for a new trial and one in arrest of judgment were denied by the court on March 20, 1931, and judgment and sentence imposed upon the defendant that she pay a fine of one hundred dollars ($100), or in default of the payment thereof, that she be imprisoned in the county jail in proportion of one (1) day's imprisonment for every ten dollars ($10) of the fine. The appeal is from the judgment and the order denying the motion for a new trial.

Important questions relating to the interpretation to be placed upon section 273a of the Penal Code have arisen in this case. Their determination calls for a discussion of the meaning of the section in the light of the common-law rules it may have been intended to declare or modify. The portion of the section under which the appellant was prosecuted reads:

"Any person who wilfully . . . inflicts thereon (on any child) *unjustifiable* physical pain or mental suffering . . . is guilty of a misdemeanor."

█ In the absence of statutory provisions, the common-law rule seems to be that a parent or a teacher (who stands *in loco parentis*) may inflict reasonable (or moderate) corporal punishment upon a child. Upon this phase of the law there seems to be no disagreement among the authorities. But when we come to the question of the *quantum* of punishment, or rather of the determination of the *reasonableness* of the punishment inflicted, we find two distinct lines of authority. One group makes the teacher the arbiter, and declares *all* punishment to be reasonable which does not

result in disfigurement of or permanent injury to the child, and which is not inflicted maliciously. The *locus classicus* on this subject seems to be *State* v. *Pendergrass,* 2 Dev. & B. (19 N. C.) 365 [31 Am. Dec. 416]. We quote therefrom:

"The law has not undertaken to prescribe stated punishments for particular offenses, but has contented itself with the general grant of the power of moderate correction, and has confided the graduation of punishments, within the limits of this grant, to the discretion of the teacher. The line which separates moderate correction from immoderate punishment, can only be ascertained by reference to general principles. The welfare of the child is the main purpose for which pain is permitted to be inflicted. Any punishment, therefore, which may seriously endanger life, limbs, or health, or shall disfigure the child, or cause any other permanent injury, may be pronounced in itself immoderate, as not only being unnecessary for, but inconsistent with, the purpose for which correction is authorized. But any correction, however severe, which produces temporary pain only, and no permanent ill, cannot be so pronounced, since it may have been necessary for the reformation of the child, and does not injuriously affect its future welfare. We hold, therefore, that it may be laid down as a general rule, that teachers exceed the limits of their authority when they cause lasting mischief; but act within the limits of it, when they inflict temporary pain.

"When the correction administered, is not in itself immoderate, and therefore beyond the authority of the teacher, its legality or illegality must depend entirely, we think, on the *qui animo* with which it was administered. Within the sphere of his authority the master is the judge when correction is required, and of the degree of correction necessary; and like all others intrusted with a discretion, he cannot be made penally responsible for error of judgment, but only for wickedness of purpose. The best and the wisest of mortals are weak and erring creatures, and in the exercise of functions in which their judgment is to be the guide, cannot be rightfully required to engage for more than honesty of purpose, and diligence of exertion. His judgment must be presumed correct, because he is the judge, and also because of the difficulty of proving the offense, or accumulation of offenses, that called for correction; of show-

ing the peculiar temperament, disposition, and habits, of the individual corrected; and of exhibiting the various milder means, that may have been ineffectually used, before correction was resorted to.

"But the master may be punishable when he does not transcend the powers granted, if he grossly abuses them. If he use his authority as a cover for malice, and under pretense of administering correction, gratify his own bad passions, the mask of the judge shall be taken off, and he will stand amenable to justice, as an individual not invested with judicial power."

The following are among the cases which accord in principle: *Boyd* v. *State,* 88 Ala. 169 [16 Am. St. Rep. 31, 7 South. 268]; *Dean* v. *State,* 89 Ala. 46 [8 South. 38]; *Roberson* v. *State,* 22 Ala. App. 413 [116 South. 317]; *State* v. *Burton,* 45 Wis. 150 [30 Am. Rep. 706]; *Danenhoffer* v. *State,* 69 Ind. 295 [35 Am. Rep. 216]; *State* v. *Thornton,* 136 N. C. 610 [48 S. W. 602]; *Heritage* v. *Dodge,* 64 N. H. 297 [9 Atl. 722]; *State* v. *Koonse,* 123 Mo. App. 655 [101 S. W. 139]; *People* v. *Green,* 155 Mich. 524 [21 L. R. A. (N. S.) 216, 119 N. W. 1087]; *Stephens* v. *State,* 44 Tex. Cr. Rep. 67 [68 S. W. 281] (under statute); *Ely* v. *State,* 68 Tex. Cr. Rep. 562 [152 S. W. 631] (under statute).

The second group of cases, and the one which, to our mind, expresses the more enlightened view—a view more consonant with modern ideas relating to the relationship between parents or those standing in their place and children—refuses to make the teacher the sole arbiter. The courts deciding these cases hold that both the reasonableness of, and the necessity for, the punishment is to be determined by a jury, under the circumstances of each case. This rule is expressed in *Clasen* v. *Pruhs,* 69 Neb. 278 [5 Ann. Cas. 112, 95 N. W. 640], in the following language: .

"A parent, teacher, or master is not liable, either civilly or criminally, for moderately correcting a child, pupil, or apprentice, but it is otherwise if the correction is immoderate and unreasonable. 1 Clark & Marshall, Law of Crimes, 133; 1 McClain's Crim. Law, sec. 242; 3 Greenleaf on Evidence, sec. 83; Wharton's Crim. Law (10th Ed.), sec. 631. In fact, this rule seems to be universally recognized by the courts of this country. If the authority to punish be limited by reason and moderation, who, then, on sound principles,

should determine whether such authority has been used in excess of its proper limits—the parents administering the punishment, or the triers of fact in a court where complaint has been made? While some authority is cited tending to support the theory that where the punishment falls short of maiming or disfiguring the body, or seriously injuring or endangering life and health, the judgment of the parent is final, and he cannot be held to answer unless it is proved that the punishment was maliciously inflicted—the leading case in support of this doctrine being *Jones* v. *State*, 95 N. C. 588 [59 Am. Rep. 282]—yet the great weight of American authority seems to be that whether or not the parent, guardian, or school-master has administered unreasonable, unnecessary, and cruel punishment to a child under his care is a question of fact to be determined by the jury."

Among the cases which accord are: *Stanfield* v. *State*, 43 Tex. 167; *Patterson* v. *Nutter*, 78 Me. 509 [57 Am. Rep. 818]; *Lander* v. *Seaver*, 32 Vt. 114 [76 Am. Dec. 156]; *Hinkle* v. *State*, 127 Ind. 490 [26 N. E. 777]; *Steber* v. *Norris*, 188 Wis. 366 [43 A. L. R. 501, 206 N. W. 173] (wherein that court—evidently disregarding its earlier decision [*State* v. *Burton, supra*], and without referring to it—adopts the more modern view); *State* v. *Spiegel*, 39 Wyo. 309 [64 A. L. R. 289, 270 Pac. 1064].

▉ In the light of these principles, the meaning of section 273a of the Penal Code is not difficult to find. We do not think that the word "unjustifiable", as used in the section, is synonymous with "unjust". It is the antonym of "justifiable", rather than the antonym of "just". "Justifiable" is defined in Webster's New International Dictionary as, capable of being justified, or *shown* to be just. In this sense it is used by Milton:

> Just are the ways of God,
> And *justifiable* to men.

The following are given as its synonyms: defensible, vindicable, warrantable, excusable, exculpable, authorizable. The word is used in this sense in law generally: 4 Words & Phrases, p. 3909 et seq.; 2 Words & Phrases, Second Series, p. 1293 et seq.; 4 Words & Phrases, Third Series, p. 683 et seq.; Penal Code, sections 197, 199, 1103. The Century Dictionary defines "justifiable" as, capable of

being justified or proved to be just or true; defensible; warrantable. It gives as synonyms, vindicable, excusable. The word comes to us from the Latin verb *justificare*—to act justly toward one (*justificus*, one who acts justly—from *justus*, just, right, and *facere*, do) through the French adjective *justifiable*. The Century Dictionary defines "unjustifiable" as not justifiable; not defensible or right. The New Oxford Dictionary defines it as capable of being legally or morally justified, or shown to be just, righteous or innocent; defensible.

By the use of the word "unjustifiable", the legislature intended to make use of the antonym of "justifiable", and to designate as criminal the infliction of physical pain or mental suffering upon a child, which *could not be* defended, or vindicated, or which was not exculpable, excusable or authorizable, under the circumstances. The standard thus set up is not abstract. It is concrete. The concept by which it shall be determined whether the punishment is or is not unjustifiable is a fluid one—like the concept by which the action of the "reasonable man" serves as a criterion in determining the violations of duty which amount to negligence. As in that instance, the test is "external and objective". (See Cardoza, Paradoxes of Legal Science, pp. 72–74.) ■ This test the legislature intended to apply not only to the *quantum* or degree of, but also to the very right to inflict, punishment. In this manner, the legislature may have encroached upon the field already covered by the assault and battery sections (Pen. Code, secs. 240, 242), while at the same time denouncing matters not reached by those sections.

The legislature by making the statute cover the degree of, as well as the necessity for, punishment, condemned, not the infliction of *all* pain (or punishment), but the infliction of pain (or punishment) which was not defensible, i. e., which could not, either as to necessity or degree, be justified as reasonable, under the circumstances, to a jury of reasonable persons. The test is not whether the infliction of the pain was *just*, but whether it is such as *can be shown* to be such. The test is thus, not abstract, subjective or absolute. It is concrete, pragmatic and relative. It is no more indefinite than the similar test in determining what shall constitute reckless driving under the penal pro-

visions of section 121 of the California Vehicle Act. See *Ex parte Daniels,* 183 Cal| 636, 642, 646, 647 [21 A. L. R. 1172, 192 Pac. 442], upholding the test of reasonableness as to speed in section 22, subdivision (d) of the Motor Vehicle Act of 1917.

By so doing, the legislature, we feel, intended to adopt the view of those courts which hold that it is an offense, even under the common-law and battery statutes, for the teacher to inflict punishment at *all* under unwarrantable circumstances or, if warrantable, that the punishment inflicted was excessive. Thus, the legislature introduced the test of reasonableness (*to be determined by a jury*) into the question of the infliction of pain in the first instance, as well as into the question of the degree. Many of the cases just cited adopt this standard, even in the absence of a statute: *Lander* v. *Seaver, supra.*

Statutes similar in purpose to section 273a of the Penal Code have been so construed. A New Jersey statute defines cruelty to a child to be "inflicting *unnecessarily* severe corporal punishment". Interpreting this statute, the court in *Richardson* v. *State Board,* 98 N. J. L. 690 [121 Atl. 457, 459], said: "What the provision of the statute aims at is to prevent unnecessarily inflicting severe corporal punishment. The offense intended to be prevented by the statute is not the infliction of severe corporal punishment, but *unnecessarily* doing so. The questions to be tried out when such a case is presented is whether there was a *necessity* for punishment and if so was it severe."

A Canadian statute provides: "It is lawful for every parent, or person in the place of a parent, school master or master, to use force by way of correction towards any child, pupil, or apprentice under his care, provided that such force is *reasonable* under the circumstances." (Crim. Code [Canada], sec. 55.)

Interpreting this statute, it has been held that the question involved in a prosecution under it is whether the punishment was *reasonable under the circumstances,* and *not* whether the teacher was actuated by malice, or whether his act resulted in permanent injury to the child. (*Rex* v. *Gaul,* 36 N. S. 504, 8 Can. Cr. Cas. 178.)

"To say," said Townshend, J., "that because defendant was not actuated by malice, and that his act did not result

in permanent injury to the child, no offense was committed, is, in my opinion, an incorrect interpretation of the section of the Code under which the prosecution was begun." (*Rex* v. *Gaul, supra,* at p. 183.)

█ The interpretation we have just placed upon our statute enables us to dispose of several questions raised. The question of constitutionality which we ourselves suggested is easy of solution. Granting that there must be certainty in the definition of criminal acts, we are of opinion that the statute does contain a fixed standard of guilt and that the principles declared in *Cline* v. *Frink Dairy Co.,* 274 U. S. 445 [71 L. Ed. 1146, 47 Sup. Ct. Rep. 681], do not apply. See *Pacific Coast Dairy* v. *Police Court,* █(Cal. App.) [298 Pac. 164]; *Nash* v. *United States,* 229 U. S. 373, 377 [57 L. Ed. 1232, 33 Sup. Ct. Rep. 780]. Reasonableness as the standard of an act—which can be determined *objectively* from circumstances—is a common, widely used, and constitutionally valid standard in law. (See *Ex parte Daniels, supra; Mulkern* v. *State,* 176 Wis. 490 [187 N. W. 190]; *State* v. *Schaeffer,* 96 Ohio St. 215 [Ann. Cas. 1918E, 1137, L. R. A. 1918B, 945, 117 N. E. 220]; note, 26 A. L. R. 897, 898; *Gallaher* v. *State,* 193 Ind. 629 [29 A. L. R. 1059, 141 N. E. 347]; *People ex rel. Stevenot* v. *Associated Oil Co.,* 211 Cal. 93 [294 Pac. 717].) █ Conformity to this standard cannot be said to be violative of the guarantee of due process of the Fourteenth Amendment to the federal Constitution or of the corresponding provision in the state Constitution. (Constitution of California, article I, section 13.) Nor can the law be said to violate any of the various provisions in the Constitution of California directed against class or special legislation, or to constitute an improper classification. (See Constitution of California, article I, section 13; article I, section 21; article IV, section 25, subdivisions 2 and 19.) Children have always been recognized as a proper subject for distinctive legislation. (*People* v. *Camp,* 42 Cal. App. 411, 417 [183 Pac. 845]; *Buelke* v. *Levenstadt,* 190 Cal. 684, 688 [214 Pac. 42].)

■ The contention that the evidence is insufficient to sustain the judgment of conviction is based upon an interpretation of the statute which would give recognition to the rule which makes the teacher the sole arbiter *of the right* to punish as well as *of the degree* of punishment to be administered, subject only to the limitation as to punishment maliciously inflicted or punishment which results in disfigurement or permanent injury. But holding to the view that this conception of the law should not be adopted in interpreting the section under consideration, the conclusion is inevitable that it was for the trial court to determine whether the punishment inflicted was unjustifiable, under the circumstances. Reduced to its simplest form—the form (to a great extent) the appellant herself adopts—the testimony may be summed up as follows: Appellant is a teacher in the city schools of Glendale, where she has been employed as principal of Thomas A. Edison School for four years. She has been a principal in the schools of that city for eight years and has been a teacher for seventeen years. She has a good general reputation in the community in which she resides for kindness and for her treatment of the children over whom she has supervision. On the twenty-fourth day of February there was a pupil in the school of which she had charge named Louis Cortese. He had been there one and one-half days. There was also a pupil in the same school named Harry Waldron. Louis Cortese is seven years old. On the second day that he was in school he was whipped. When he got out of school he went home to get a sweater and then went back to school for his book. As he was going back to school he met another little boy and an altercation occurred between them. As the result of this altercation, the details of which are involved in conflict, a whipping was administered by the teacher, who used a wooden paddle therefor, in the presence of two other teachers. The boy lay flat on his stomach upon a table when the whipping was administered with a paddle some eighteen to twenty inches in length, some three inches in width and about one-half inch in thickness. The details of the whipping were given by the child's brother, Frank Cortese. He testified: "When Louis was whipped he was laying on his belly flat, right up on the table. I saw him when he was whipped. I saw the paddle up at that

time. The paddle marked People's Exhibit 'A' looks like the one she used. She used the paddle like this (raising and lowering paddle). She held it back over her shoulder about like this. (Indicating.) She struck him with that paddle about thirty or thirty-one times after that I could not see any longer, I was crying. I counted the number of times she hit him with the paddle because I was going to tell my parents about it. The other two teachers were laughing while the paddling was going on. After the paddling was over she says, 'Do not forget that sample, next time it will be more'. Then Louis and I went straight home. After I got home he took me in the bathroom and showed it to me, a little bit and later mother came home and he told her about it and she did not— After Louis and I got home we went outside and I went and skated around a little bit. It was seven or .a little after seven, before Louis went in the house. After we went in the house, Mother when she was putting him to bed she saw it and then Dad happened to come home and he said—Mama said 'see it'. I sleep in the same room that Louis does. I did not sleep in there that night. Louis kept me from sleeping that night. He could not sleep at all, he could not sleep all night he was crying and everything. He could not go to sleep he was getting up and everything. I slept in the room with Louis that night. I saw him .undress every night. I saw Louis when he undressed the night before the whipping, there was nothing on his body. There were no marks on that portion of his body at all.''

The boy was examined on the evening of February 24, 1931, with reference to the presence of marks and bruises on his body. The testimony of Dr. D. W. Hagan indicates the nature and extent of the marks and bruises. He testified: ''I saw that his buttocks were quite red on both sides on an area of about four or five inches in circumference. On either side was black and blue marks, that is, on the right hip there was a black and blue mark. That mark was about two inches in space. It was right above the hip bone, at the head of the hip bone.''

The testimony of Mrs. F. A. Miles, who saw the boy late that afternoon, throws further light upon the appearance of this bruise: ''It was black and blue across his hips and the upper part of his leg, the entire leg; there was

one particular spot of black and blue on his hip; I believe it was his right hip. He seemed to have welts on the upper part of his body and just below the small of his back and it was black and blue, an extra mark on his hip going out of the angry red. It seemed to be worse right below the lower part of his back.''

The testimony of the mother of the boy is as follows: ''He was black and blue, not so black, more red like. There was a big black spot on his right-hand side and the marks go clear across. The marks were red and kind of puffed up; the skin appeared to be puffed up too.'' Similar testimony was given by the father of the boy, who also testified as to the pain suffered and the family's attempts to relieve the suffering. Another witness, Mary Lou Cortese, who examined the child in the afternoon, testified to the condition of the child's buttocks. She found no bruises or marks.

A captain of police, V. B. Brown, a nurse, Ellen Jensen, and Dr. R. L. Kauffman, who examined the boy later in the evening, testified to the finding of discoloration and welts on the buttocks and of a bruise and discoloration on the right hip bone.

Two teachers were present when the whipping was administered. Margaret B. Longley testified, ''Mrs. Curtiss paddled him from five to seven, not to exceed seven times.'' Mrs. Katie M. Tyler testified that ''He took the nuts out of his pockets and got on the table and laid flat on his stomach.''

The boy, Louis Cortese, himself, testified that he showed the marks to his brother Frank, but there is no testimony that he showed Frank a large black and blue spot on his hip. ''After that I went home with my brother Frank. I showed Frank the marks, then I put on my pants and went in the house and laid on my stomach because my back hurt.''

The defendant herself testified: ''Louis was lying flat on his stomach on the table.'' And further: ''I took my paddle and paddled him on the buttocks squarely on the fleshy part of the body, giving him several strokes.''

Other testimony by and on behalf of the defendant need not be set forth here. It may not be amiss, however, to state that there was evidence to the effect that the boy had fallen from the curb to the street two days after the

accident, while he was riding on roller skates, which might account for the presence of marks upon the hip on the day of trial.

Even the cases which adopt what might be called the ancient rule, requiring malice to be shown, allow malice to be inferred from the excessiveness of the punishment. (*State* v. *Thornton, supra; State* v. *Black,* 60 N. C. 263 [86 Am. Dec. 436]; note, 65 A. L. R. 890, at pages 897, 898; note, 1 British Ruling Cases, 718, at pages 720–724; note, 12 Ann. Cas. 353, at pages 355, 356.) There were, therefore, facts in the record from which the trial judge could find that the infliction of the punishment was unreasonable. That he chose to disregard the statements of the appellant and of other teachers of excellent repute cannot deprive his conclusion of the force to which it is entitled in law— even if we were to assume that had we been the triers of fact, we might have chosen to believe their version of the incident. ▪ A good deal is said in the argument about the effect upon the trial court of the bruise on the hip. It is insisted that there is no showing that this was caused by the whipping. Had we, in interpreting the statute, adopted the view that disfigurement or permanent injury is necessary, perhaps the point might have gained significance. But the views we have expressed as to the criterion of reasonableness does not make injury or disfigurement the line of demarcation between the lawfulness and the unlawfulness of the punishment inflicted. In the light of this interpretation, the trial court's conclusion that the pain inflicted was unjustifiable can be sustained, even if the evidence as to the bruise be disregarded. The evidence came in as part of the description of the boy's physical condition, soon after the punishment was inflicted. As we interpret the statute under which the appellant was prosecuted, neither malice nor any other specific intent is necessary to constitute the offense. But, as already pointed out, malice may be inferred from excessiveness. And even in offenses dependent upon a specific intent, the intent may be inferred from the circumstances of the act. (*People* v. *Bowman,* 24 Cal. App. 781 [142 Pac. 495]; *People* v. *Franklin,* 46 Cal. App. 1, 5 [188 Pac. 607]; *People* v. *Moore,* 82 Cal. App. 739, 748 [256 Pac. 266].) It was not necessary that permanent injury be shown to exist before the court could find that excessive

punishment had been inflicted. ■ And even if it be conceded that there is no direct testimony that punishment (irrespective of degree) was unmerited—under the circumstances—we take it that the trial judge was not bound to accept the opinion of the appellant to the effect that it was merited. He could determine the question from a consideration of the circumstances under which the punishment was inflicted, and reach the conclusion—as stated by him at the close of the case—that its infliction for the alleged injury to another boy, was *without cause,* because the defendant made no attempt "to gain any facts in relation to the matter; she preferred to rely upon the unsupported statement made by the mother who was, no doubt, more or less agitated by reason of the alleged injury inflicted upon her boy". And as the court was warranted in reaching this conclusion upon the evidence, the judgment would have to be affirmed, even if there were *no* evidence of excessive punishment in the record.

■ Certain alleged errors in the proceedings have been stressed. Misconduct is charged against the prosecutor, because when witness Stanley McIntosh (a boy six and one-half years old) was recalled to testify as to the Cortese boy's fall two days after the alleged whipping, he stated:

"Now, counsel has had an opportunity to refresh the boy's memory and he wants to put him back on the witness stand." The remark was not assigned as misconduct, at the time it was made. And we fail to see in it a charge of manufacturing evidence. (See *Lafargue* v. *United Railroads,* 183 Cal. 720, 723, 724 [192 Pac. 538].) This is the more true when it is borne in mind that the cause was not tried before a jury, and that, in view of the tender age of the witness, and the fact that he had previously denied any recollection of the incident, counsel for the defendant could quite properly refresh his recollection without being guilty of any reprehensible conduct, and his opponent charge him with the doing of it without meaning to impugn his motives. Assuming the remark to have been improper, it was isolated, and not of the aggravated and continuing character which the court condemned in *People* v. *Tufts,* 167 Cal. 266, 271, 274 [139 Pac. 78], and in *Keena* v. *United Railroads,* 197 Cal. 148, 156–158 [239 Pac. 1061].

■ The trial court sustained an objection to the con-

versation between the appellant and Mrs. Waldron, the mother of the boy whom the Cortese boy was alleged to have kicked. The prosecutor stipulated "that Mrs. Waldron called Mrs. Cortese over the telephone and said that this boy had kicked her boy". We fail to see how any further conversation on the subject was either material, or could have added to the fact. ▇ Nor was it error not to allow the appellant to testify to the condition of the body of the Waldron boy where he had been kicked, when she saw him the day after the occurrence. Facts she learned afterward would not supply a reason or excuse for what she did when she did not know them. ▇ The affirmative answer of Stanley McIntosh to the question whether the next day he and the Cortese boy were "playing around the same as usual" was properly stricken. Assuming that the child understood the phrase, the question called clearly for a conclusion. It did not call for a description of the appearance of a person. And the witness immediately thereafter testified that he saw the boy "playing". It was for the court to determine whether the boys were playing as "usual", or not. ▇ Nor was it error to strike the testimony of the witness A. V. McIntosh as to what the Cortese boy said when the latter came over to their house that night at 7 P. M. and posed as a doctor. ▇ There is no misconduct in the fact that the magistrate saw, before the trial, the paddle used and a copy of the written report of Dr. Remmen, whom he had appointed at the appellant's request, to examine the child. Dr. Remmen testified fully at the trial to the results of his examination, and the paddle was an exhibit in the case. Even in the case of a jury no error can be predicated upon reception of evidence out of court, where the same evidence is received in court. (*People* v. *Yee King*, 24 Cal. App. 509 [141 Pac. 1047].) ▇ Besides, reception of evidence out of court *by the court* is not a ground for a new trial. (Pen. Code, sec. 1451.)

Upon the motion for a new trial, several affidavits were filed purporting to set forth newly discovered evidence. ▇ It is elementary that the evidence which calls for a new trial must be material—such as to render a different verdict reasonably probable—and such as could not have been discovered and produced, with reasonable diligence, at

the trial. (Pen. Code, sec. 1451, subd. 7; *People* v. *Oxnam*, 170 Cal. 211 [149 Pac. 165]; *People* v. *Staigers*, 92 Cal. App. 628 [268 Pac. 923]; *People* v. *Vejar*, 93 Cal. App. 259 [269 Pac. 671]; *People* v. *Walton*, 97 Cal. App. 782 [276 Pac. 426]; *People* v. *Hewitt*, 101 Cal. App. 306 [281 Pac. 666].)

There is no showing of reasonable diligence in the affidavit of the appellant, filed on the motion—no showing why the testimony could not have been discovered by the exercise of due diligence. There does appear in many of these affidavits the statement that the facts therein contained were not called to the attention of the defendant and her counsel. Let us assume that this amounted to a failure to disclose or concealment which prevented discovery by the defendant. The fact remains that the evidence *is not* of the character which calls for a ruling that the trial court abused its discretion in denying a new trial. To particularize: One group of affidavits are in corroboration of the fact that the boy fell two days after the occurrence. Some of them might also indicate that the answers given by some of the prosecution witnesses as to the boy's presence elsewhere upon that occasion may have been suggested by the boy's father. As the defendant and two of her witnesses testified to the fall, which the father of the boy and others denied, the proffered testimony was merely corroborative and impeaching.

Two affidavits relate the fact that the Cortese boy was seen to fall on February 24th, and strike his right hip. This fall, on the day of the paddling, may account for the presence of the bruise upon the hip, discovered late that evening. There is nothing new in this testimony. The testimony of the defendant and of the teachers present at the paddling was to the effect that nothing was hit by the paddle except the soft, fleshy part of the buttocks. This negatives the possibility of a bruise on the hip resulting from the paddling. There is, therefore, evidence in the record upon this subject and the proffered testimony is in this respect also cumulative and impeaching only. It is not of the character for which motions for new trial are granted. (*People* v. *Hewitt, supra.*) There is greater justification for applying this principle here, because the judgment must be sustained even if there be no evidence what-

ever of excessive punishment. Of like character is the proffered testimony relating to the fact that the defendant knew of the weak physical condition of the Waldron boy before the occurrence.

In this, as in the other respects, the record is free from error. The nature of the case—the fact that to a person in the position of the appellant, a judgment which finds her guilty of inflicting unjustifiable punishment on a small child may cast a reflection upon an otherwise unblemished school career—called for a detailed discussion of all the points urged in her behalf.

Our conclusion is that the record discloses no error which would warrant a reversal of the judgment and of the order denying a new trial. The judgment and order are, therefore, affirmed.

McLucas, P. J., concurred.

Shaw, J., did not participate.