Filed 1/21/14; opinion following rehearing

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| VERONICA GONZALEZ,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>SANTA CLARA COUNTY<br>DEPARTMENT OF SOCIAL SERVICES<br>et al.,<br><br>    Defendants and Respondents. | H038241<br>(Santa Clara County<br>Super. Ct. No. CV204141) |

Appellant Veronica Gonzalez (Mother) was reported for child abuse after she spanked her 12-year old daughter, A.P. (Daughter), using a wooden spoon with enough force to produce visible bruises. The Santa Clara Department of Social Services (Department) concluded that the report was "substantiated," and submitted it to the state Department of Justice for inclusion in the Child Abuse Central Index (CACI) under the Child Abuse and Neglect Reporting Act, Penal Code sections 11164 through 11174.3 (CANRA or Act). Mother unsuccessfully sought relief by administrative appeal and by petition for administrative mandamus in the superior court. On appeal to this court, she contends that neither the Department nor the superior court gave sufficient weight, or any weight, to the right of a parent to impose reasonable discipline on his or her child. We will sustain this contention. We also sustain Mother's contention that the hearing officer committed a palpable and prejudicial abuse of discretion by refusing to permit Daughter to testify, citing the rationale—which flew in the face of the only evidence before him— that she would be traumatized by the experience.

In reaching these conclusions we neither consider nor decide whether spanking is a sound form of discipline. That is a question entrusted not to this court, but to the people's representatives in the Legislature. We hold only that the Legislature has recognized the right of parents to impose reasonable corporate punishment on their children as a legitimate disciplinary measure. If the Legislature wishes to prohibit spanking, or to impose strict liability on parents where otherwise reasonable discipline causes bruising, it is more than competent to do so. Here the record does not show that any consideration whatever was given to the parents' right to impose reasonable discipline on their children or to basic principles of fair procedure. We will therefore reverse the judgment of the superior court with directions to order the Department to either conduct a new hearing or set aside its finding that the report is "substantiated" and to inform the Department of Justice that the report is "unfounded."

## BACKGROUND

Prior to the events giving rise to this matter, Mother and her husband (Father) had become gravely concerned about Daughter's declining academic performance and alarming social tendencies. As Father put it, Daughter "had decided that she did not have to do her school or home work, repeatedly lied to both of us, [and] started showing interest in gang culture."[1] Mother declared that Daughter had become "boy crazy and started to mingle with a new type of crowd," and that they had found pictures and text messages on her mobile phone "in reference to gangs." They "had many discussions" with Daughter about these developments, but to no avail: "She would hear us yet

---

[1] Mother read her declaration into the record at the hearing. In anticipation of Father's testimony, the hearing officer stated that Father did "not need to read this declaration but if he has anything he would like to add he is more than welcome to come in and make a statement." We take this to mean that his declaration was accepted as direct testimony. The Department lodged no objection to that or any of the other 14 declarations entered into the administrative record by Mother.

continued to go down this road . . . .  [S]he began saying that her favorite color is red . . . . [S]he was not doing many of her school and homework assignments and even her teachers expressed . . . annoyance with her disregard for her work.  We also discovered that [Daughter] had been lying to us about completing assignments and had been hiding test[s] with low scores that were supposed to have gotten signed by us."  Daughter's older sister (Sister) also declared that Daughter's "interest in gangs seemed to be growing." She "started to become very irresponsible in school by being late to classes, having really bad grades because she was doing hardly any of her school and homework, was lying to my parents about lots of things, and started hanging around wanna-be gangster kids at school."  Daughter herself declared, "I have to admit, for a long time, starting in 6th grade, I was always getting to class late, not doing my school assignments, and lying to my  parents."  She acknowledged that milder disciplinary measures had failed to influence her:  "When I first started doing all this, my parents grounded me many times, by taking away all my fun stuff like my iPod, my T.V., my cell phone, and I was not allowed to hang out with friends. I don't know why that stuff didn't work on me, but I continued to not do what I was supposed to."

Mother described in more detail the failure of these less stringent methods of discipline:  "[A]fter a few weeks of grounding when [Daughter] would get off of restriction she would do better for a short time, but then revert back to the same behavior, over and over.  We would go through several sessions of groundings over several months, hoping it would finally make the difference, but grounding proved to be ineffective at setting [Daughter] back on the right path.  At this point, we did not know what else to do to help [Daughter].  We talked again, and felt that the only other option out there, would be to try spanking.  So the weekend before the incident in question, my husband and I sat [Daughter] down and explained to her that, since she kept lying to us repeatedly about completing assignments, she now needed to get her agenda signed by each teacher so we

3

could be sure she was really doing all of her work. We also informed her that if she continued with this irresponsible behavior, [such as] not doing her assignments, being late to class and lying to us, she would start to receive one spank on the bottom for each thing not done. She understood the new consequences. but still chose to continue the bad behavior."

According to the Mother, on each of the first three days of the new regime Daughter came home without having "complet[ed] her tasks." This resulting in her being spanked by Father "with his hand, only on the buttocks, fully clothed, and in a calm manner." (Capitalization removed.) When Mother picked Daughter up at school on Thursday, April 29, 2010, she had again failed to comply with her parents' directives. She gave implausible excuses, a further violation of parental orders. Mother called Father "and told him that [Daughter] still wasn't doing her work and was late again, and that he needed to come home and deal with this. He told me he wouldn't be home until late that evening and that I needed to handle it, or else [Daughter] would not respect me or take me seriously as a parent. Because of my hand condition, he said I should just use a wooden spoon. I told him that I'd rather he just spank her when he gets home from work, but he insisted that I should handle it. I finally agreed and told [Daughter] that I would have to be the one to spank her this day and that I was going to use a wooden spoon because my hands hurt." Father also declared that the idea of using a spoon had been his, and had arisen from the exigency of his not coming home until "very late that evening."

Mother declared that upon arriving home, she retrieved a wooden spoon and "gave [Daughter] around five or six spanks on the bottom, one for each thing not done and for making excuses. [Daughter] was fully clothed during the spanking. She was not crying or screaming during the spanking." (Capitalization removed.) Family members declared unanimously that spankings had been a rarity in the family, that they had only been given

4

in response to misbehavior, that they were never given in the heat of anger, and that they were almost always given by Father, and always with an open hand.

On the next day Daughter disclosed to some friends that she had been spanked with a wooden spoon. One of them reported, or "tricked" Daughter into reporting, the matter to school authorities.[2] An unnamed "mandated child abuse reporter[]"— manifestly a school employee—filled out a "suspected child abuse report." (Emphasis omitted.) Under "[i]ncident [i]nformation," the reporter wrote, "Victim says she gets 'smack' by parents when she is not doing what parents are expecting from her. She said Mom hits her with a wooden spoon and Dad hits her with his hand. Last time she was hit was on 4/29/10 on her botto[m] / picture was taken."[3]

[2] Daughter declared without contradiction, "I did tell one of my classmates, J[.], that I got spanked . . . . She tried to convince me to tell the office, but I told her that I didn't need to or want to. J[.] took me to the school office to tell them that I got spanked, but I didn't know she was going to do that. She tricked me into going with her by saying she needed to pick up her sweater because she was cold."

Another friend declared, "I hung out with [Daughter] at lunch the day this whole thing happened at the school. [Daughter] was crying hard. I asked her what was wrong and she told me that stupid J[.] told the people in the office that her mom spanked her, and that they kept her in the office and wouldn't let her leave, and they made her miss choir class. . . . She was crying about J[.] telling and how the office people wouldn't let her go."

[3] School authorities reported that the photograph was taken at Daughter's request, but Daughter flatly contradicted this: "I DID NOT ask the nurse to check my butt OR allow her to take pictures of it. They told me I HAD TO, as if I had no choice, and told me to take my pants down so they could take a picture, even though I was saying 'no' and felt embar[r]assed and miserable."

Daughter returned to this subject near the end of her declaration: "I demand that any and all pictures of my butt be removed from any files and returned to me so that I can destroy them. I never gave permission to anyone to photograph my butt and my parents never gave permission either. I do not give anyone permission to look at any of those photos any longer. Thank you." This demand was ignored. Worse, and astonishingly, the photograph or a copy was lodged with the administrative record in the superior court, apparently unsealed, and a photocopy of that exhibit is included in the clerk's transcript

A social worker from the Department was summoned to the school. Daughter told the social worker that she had "not been getting along" with her mother due to declining grades. As reported by the social worker, Mother had "told [Daughter] if she does not get her planner signed by all her teachers to prove she complete [*sic*] her work or wrote [*sic*] down her assignment she would get hit with a wooden spoon."[4] Daughter supposedly told the social worker that on the previous day, "she was not feeling too well and did forget to get one of her teacher's signatures and so when she got home [Mother] told her she was going to get four smacks on the butt with a wooden spoon for no signature and for making excuses. [Daughter] stated that her butt is very sore today and her friends asked what was wrong and she talked to them what happen [*sic*], even though her parents told her to never tell anyone about the spanking. [Daughter] started to cry and said she was scared of causing more trouble for herself." According to the social worker, Daughter attributed statements to Mother that "she needs to smack her with a spoon so it will hurt more." Daughter also supposedly reported that when receiving the spanking,

---

on appeal. On our own motion, we have ordered that all copies in possession of this court, the trial court, or the parties, be filed under seal.

[4] Daughter flatly denied or materially qualified nearly every statement attributed to her by the social worker. In this instance she declared, "It says that I said that I would get 'hit' with a spoon if I did not get my planner signed by my teachers. That is not what I said. What I said was, 'I would get spanked if I kept lying and not doing my work and didn't get my planner signed'. I never said it would be with a wooden spoon or that my mom would do it. I did not explain to them, and they didn't ask, that my parents talked with me about starting spanking because grounding wasn't working for all these months, and that my mom only used the spoon cuz of her hands and cuz my dad wouldn't be home, and only this one time."

She also protested more generally about the attribution to her of the term "hit": "It keeps saying that I said I got 'hit' but I did not say that. I said 'spanked'. THEY kept saying 'hit' and I kept saying, 'no, spanked', but they would not listen to me."

6

"she had to remove her clothes and bend over the bed."[5] Daughter reportedly "stated she is scared of [Mother and Father] and knows she needs to be good to avoid getting a smack, but sometimes she has a hard time." The social worker also reported that Daughter "asked if she could stay [with] her paternal grandmother tonight because she was scared to go home," and that Daughter "ha[d] thought about staying with her paternal grandmother because she seems to get along better with her and things are not so scary."[6]

The parents "came to the school," where they were questioned by the social worker, as well as by police, whom the social worker had summoned. Mother told the social worker that Daughter "ha[d] been lying to her about doing her homework and her grades have been declining. [Mother] ha[d] been taking [Daughter's] phone away and grounding her but nothing seem [sic] to work. [Mother] stated she talked to [Daughter] and warned her that she would begin to use smack and stated that she just started smacking [Daughter] with a wooden spoon last week and has been spanking her almost

---

[5] All family members forcefully repudiated this statement. Daughter declared, "I NEVER, EVER told ANYONE that my mom spanked me without any clothes on and bent over. I don't know where they got that from or why they would say that. That makes me really MAD." Mother and Father also took strenuous exception to this suggestion, both insisting that spankings had always been administered over Daughter's clothing. The older sister declared that the suggestion of spanking "without any clothes on and bent over the bed" was "just sick, and although I wasn't there at that moment, I KNOW my mom would NEVER do something like that."

[6] Daughter: "I NEVER said I was scared of my mom and dad. [¶] . . . I NEVER said that I wanted to stay at my grandma's house because things are not scary over there. I SAID, that I COULD go to my grandma's house IF THEY did not allow me to go home, and I only said this because they asked me, 'where would you want to go IF you could not go home?'. I DID tell them that I wanted to go home and relax, more than once. One of the cops even came in and asked me towards the end of this very long day, 'what would you like to do now?' and I replied, 'I just want to go home and relax.' So OBVIOUSLY, I'm NOT scared of my parents or uncomfortable at my home."

7

every day."[7]  Asked whether she thought this was effective, Mother  reportedly stated that "she believes it was working and she is doing the best she can to raise [Daughter] right and [that she] did not want [Daughter] to end up like her with a limited education. [Mother] stated that she did not mean to leave marks but stated she had to use to a wooden spoon because she is so small her hand would not even be felt if she tried to smack [Daughter] with her hand."[8]

After Daughter and both parents had been questioned by a police officer, the anonymous reporter told the officer "she did not believe this case needed to go further." Daughter "was reunited with her parents."

About two weeks later, the social worker visited the family home.  Both Mother and Daughter told her that things seemed better between them, that Mother had administered no further physical discipline, and that they did not need counseling or other resources.  Mother stated "she can't believe that the report was done and that everyone thinks she is a bad parent.  [She] stated she loves kids and it would be a great disservice if

---

[7] All four family members declared that this was the only time Mother ever used a wooden spoon to spank Daughter.

[8] Several versions of Mother's reasons for using the spoon appear in the record. The police report attributes to Daughter the statement that "her Mother uses the spoon because [Mother's] hand does not hurt," which could mean either that Mother's hand did not inflict pain on Daughter or that by using the spoon Mother avoided hurting her own hand.  According to Mother, both of these were factors:  "When the kids were smaller, either I or my husband would administer a spanking, but as the kids got bigger, they didnt even seem to blink if I spanked, particularly [Daughter].  She has a very sturdy and solid frame and it came to the point where my spank was so weak to her, she'd just scoff at me and walk away like nothing.  Also, the older I've gotten, my hands are often in pain, making everyday tasks painful and difficult.  Writing, typing, knocking on doors, flossing, cooking and preparing food, and holding the steering wheel are some examples of tasks that can bring on the pain, which is why in more recent years, if a spank was necessary, it was usually given by [Father]."  This was compressed elsewhere in the police report to the statement that "hand spanking did not work.  [Mother] is small and said it hurt her more than [Daughter]."

8

she would not be able to work with children. [She] is thinking about becoming a physical education teacher someday. [She] reports that she had confronted difficult kids and feels she has been successful in changing things around for them."

Nothing in the social worker's report suggested that there was any violence in the home apart from disciplinary spankings. Daughter reported that her parents often disagreed, but she "d[id] not remember things ever getting physical." Sister, when questioned by the social worker, confirmed Daughter's report that Sister "did not have concerned [*sic*] at home or school, and is not scared of [the parents] and stated that she manages to stay out of trouble unlike [Daughter]."

The social worker nonetheless concluded that there was "still some risk" to Daughter because Mother had resorted to spanking with a wooden spoon when frustrated, had persisted in this practice "even though the behaviors were not changing," and had declined to pursue counseling when it was suggested earlier. The social worker concluded her report as follows: "The allegation of physical abuse is substantiated against [Mother]. [She] reported hitting [Daughter] with a wooden spoon after making other attempts to address [Daughter's] behaviors. [Mother] decline services [*sic*] and need for resources for counseling [*sic*].[9] The undersigned did report [Mother] to the department of justice."

---

[9] Mother's willingness to accept "services" was supremely irrelevant to the question whether she had inflicted reportable child abuse on her daughter. Further, the record on this subject is highly ambiguous. Although the transcription may be garbled, the social worker appeared to testify that efforts to get school counselors involved in the family had been underway when the events in question occurred, but had not yet borne fruit because the counselor had not yet spoken with Mother. The counselor, who was present during the social worker's original questioning of Daughter, supposedly said then that Mother had "refused" to sign a required permission slip. But when asked whether he or she had "contacted" Mother, the counselor reportedly replied, "yes but we have not been able to touch base." The social worker's original report described Daughter as saying that Mother "did not want to sign" a permission slip, but also said Daughter was "unsure" whether Mother "did not want to consent to her getting counseling at school."

9

On or about July 14, 2010, the social worker prepared a "child abuse summary report" for submission to the state Department of Justice. (Capitalization removed.) It described the abuse as "physical" and under "nature of injuries" listed "bruises on botom [*sic*]." Also prepared on that day was a "notice of child abuse central index listing," (capitalization removed) addressed to Mother, stating that Department had "completed an investigation of alleged child abuse or neglect," and had found the allegations "substantiated." Daughter was named as the "alleged victim." In a space for "the specific act(s) of abuse or neglect alleged against you," the only entry was "physical abuse." The notice indicated that if Mother "want[ed] to challenge [her] listing on the CACI," she must submit a request for a "[g]rievance" hearing within 30 days.

On a date not disclosed by the record, Mother submitted the required request for a hearing. After a number of continuances, the matter was heard on February 24, 2011. Early in the hearing, Mother informed the hearing officer that her attorney had "abandoned" her without notice a week earlier. She did not request a continuance, however, and the hearing officer began taking testimony. He first asked the social worker to "tell me exactly what [you] did in her investigation, just kind of give me an overview of what happened from the time you received the referral." The ensuing narrative largely conformed to the written report. At its conclusion, the hearing officer may have attempted to convey to Mother that she was entitled to question the social worker. Possibly misunderstanding his rather vague remarks, Mother indicated that she wished to present her own testimony. She then gave her narrative of events, consisting largely of a reading of her declaration. The hearing officer refused to permit Daughter to

---

Coupled with the counselor's statements that efforts to establish communication had not yet succeeded, the implication seems to be that Mother was not willing to sign the "slip" without further explanation. Beyond this and the family's expressed belief that it did not need services, nothing in the record supports the "refus[al]" attributed to Mother by the social worker's report.

testify. (See pt. II, *post*.) Father then testified, taking particular issue with the social worker's claim "about bending [Daughter] over the bed and spanking her on her bare butt, which has never happen and I do not know where that came from." After Father concluded his testimony the hearing officer asked an additional question of the social worker, and counsel for the Department asked a question of Father. The transcript then abruptly ends. It appears from the declaration of the custodian of records, which accompanied the administrative record, that further proceedings took place, the record of which was lost. (See pt. IV, *post*.)

On the next day the hearing officer issued his "recommendation and summary of findings." (Capitalization removed.) He acknowledged the presence of "several points of contention in the case," including the question whether the spanking was administered with pants down: "[Mother] is emphatic that she did not ask [Daughter] to pull down her pants before she spanked her and [Daughter]'s declaration supports this statement. However, the [social worker's investigative narrative] states that [Daughter] told her that she had her pants down." There is no indication of how the hearing officer resolved this or the numerous other conflicts between the social worker's testimony and that of the family members. (But see pt. III, *post*.) He attributed a number of contentions to Mother, including that (1) Daughter's bruising "is not a traumatic condition and does not meet the criteria in the Penal Code for Physical Abuse"; (2) the bruises "were not major, not intended . . .[,] not known during the spanking[,] and were an accident"; (3) the spanking did not "constitute[] Child Abuse"; and (4) it was not "unlawful corporal punishment or injury" as defined by statute. In apparent response to these contentions, he wrote, "The spanking administered by [Mother] was not an accident and was willful, and the fact that she did not intend to cause harm to her daughter does not make the bruise an accident. The evidence shows that [Mother] did spank her daughter with a wooden spoon, causing bruising to her daughter's buttocks. Bruising is an injury and can be

11

considered a traumatic condition. [Mother]'s actions meet the definition of physical abuse and unlawful corporal punishment as defined in the penal codes. [¶] Therefore I am recommending that this referral continue to be classified as substantiated and that there be no change in the CACI."

On March 18, 2011, the then-director of the Department issued a concurrence in the hearing officer's decision.

On June 30, 2011, Mother filed a petition for writ of administrative mandamus (Code Civ. Proc., § 1094.5) asking the superior court to command the Department "to set aside and revoke" the hearing officer's order and the director's concurrence. She filed an amended petition on November 29, 2011. Among the arguments set out in her supporting memorandum was that the "discipline of her daughter was a lawful form of corporal punishment [that] does not rise to the level of child abuse under Penal Code § 11165.6." (Capitalization removed.)

At the hearing on the petition, the court expressed its view that the case presented no factual issues for resolution, and that the court was not empowered to determine whether the record established a case of child abuse. The court ultimately ruled from the bench as follows: "[A]s I have already indicated my position here is not to agree or disagree with the findings of the administrative hearing. My job, I believe, is to determine whether or not there was a proper administrative hearing and or whether this was abuse of discretion. [¶] . . . I can't look to the consequences then look back and try to make a decision about whether or not the administrative hearing was correct. [¶] It's an unfortunate situation, but in my role here I believe that there has not been sufficient basis set forth to grant the writ. So, based upon that I am going to [deny the writ]."

Counsel for Mother requested a statement of decision. The court expressed doubt that she was entitled to one, but invited counsel to "submit something to me and I will consider it." On the next day the court issued an order stating that Mother had made a

12

timely request for a statement of decision, and directing counsel for the Department to prepare and submit a tentative statement of decision. Slightly over a month later, the court executed a 12-page statement of decision prepared by county counsel. The statement included factual recitals drawn largely from statements attributed to Daughter by the social worker. It did not mention conflicting evidence, including Daughter's own contrary averments. For example, the statement recited as a fact that "[t]he child said that the mother told her that she used the wooden spoon because it would hurt more," despite testimony and declarations from family members to the effect that Mother used the spoon because her hands were sensitive and she was unable to strike hard enough to make an impression. (See fn. 8, *ante*.) The statement recited that Daughter "let the school nurse check her behind and take a picture of it," disregarding Daughter's unequivocal averment that she was coerced into exposing her buttocks. The statement also adopted the social worker's report that Daughter had told her "that the mother made her remove her clothes and bend over the bed when she hit her," without acknowledging Daughter's vehement denial that she had made any such assertion and all four family members' strenuous contradiction of the assertion itself. The statement recited that Daughter had said she "is afraid of her parents," without noting the qualification—reflected in the social worker's own live testimony—that Daughter had said she was afraid she had gotten into more trouble because of the classes missed due to her lengthy interrogations over this incident.

In its recital of background facts the statement of decision acknowledged Mother's assertions that she "had not abused the child but had only attempted to discipline her." The statement addressed that issue as follows: "The mother attempts to avoid the import of Sections 11165.4 and 11165.5 by arguing that she was only a concerned parent who was at her wits end trying to get her child's attention when all previous disciplinary measures had failed. But the legislature, in its wisdom, has elected not to include a 'good intentions' exception to these statutes, which are designed to prevent child abuse. This

13

Court finds that the Review Officer did not abuse his discretion in determining that the mother's physical discipline of the child on April 29, 2010, constituted child abuse."

The statement acknowledged that, contrary to the court's statements at the hearing, it was obliged to exercise its independent judgment to determine whether the findings necessary to sustain the hearing officer's decision were in turn supported by the evidence in the administrative record. The statement recited that the court had "re-reviewed the evidence independently following the hearing." The statement concluded that the hearing officer's findings were supported by the weight of the evidence.

The court issued both a judgment and a separate order denying the petition for writ of mandate and finding that "proper procedures were followed and there was no abuse of discretion." Mother filed this timely appeal.

## DISCUSSION

### I. Parental Disciplinary Privilege

A. *Standards of Review*

Because recordation in CACI as a probable child abuser impinges upon fundamental rights, the superior court must exercise its independent judgment in determining whether the evidence before the Department established that the report is "substantiated." (*Saraswati v. County of San Diego* (2011) 202 Cal.App.4th 917, 928 [independent review warranted by "the right to familial and informational privacy impacted when a parent is publicly identified as a possible abuser of his or her child"].) On appeal from the trial court's judgment in such a case, the precedents do not authorize the reviewing court to exercise its independent judgment with respect to the trial court's factual findings. Rather the court is required to apply the substantial evidence rule, under which the trial court's findings must be upheld if supported by substantial evidence. (*Roy v. Superior Court* (2011) 198 Cal.App.4th 1337, 1346, quoting *Griffiths v. Superior Court* (2002) 96 Cal.App.4th 757, 767-768 ["After the trial court exercises its

14

independent judgment in reviewing the facts, the appellate court confines itself to determining whether substantial evidence supports the trial court's findings."].)[10] With respect to questions of law, of course, the appellate court exercises its independent judgment. (*Ibid*.) And where the controlling facts are undisputed, their effect is a question of law. (8 Witkin, Cal. Procedure (5th ed. 2008) Extraordinary Writs, § 279, p. 1193, citing *David Kikkert & Associates v. Shine* (1970) 6 Cal.App.3d 112, 116.)

### B. *Applicability of Privilege to CANRA*

The question before the hearing officer, and the trial court, was whether the evidence established a "substantiated" report of "child abuse." (Pen. Code, § 11169, subd. (a).) A report is " '[s]ubstantiated' " if the conduct reported is "determined by the investigator who conducted the investigation to constitute child abuse or neglect . . . , based upon evidence that makes it more likely than not that child abuse . . . occurred. A substantiated report shall not include a report . . . [found by] the investigator who conducted the investigation . . . to be false, inherently improbable, to involve an accidental injury, or to not constitute child abuse or neglect as defined in section 11165.6." (Pen. Code, § 11165.12, subd. (b).) In addition to " 'neglect,' " which is not at issue here, the Act recognizes five categories of " 'child abuse,' " two of which are arguably implicated here. (Pen. Code, § 11165.6.) The first, " 'willful harming or injuring of a child," is defined as "willfully caus[ing] or permit[ting] any child to suffer, or inflict[ing] thereon, unjustifiable physical pain or mental suffering." (Pen. Code, § 11165.3.) The second, " 'unlawful corporal punishment or injury,' " is defined as

---

[10] This approach continues to hold sway although it has been criticized by the leading commentator on California procedure. (See 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, §§ 385-387, pp. 441-445, citing with approval, *Moran v. Board of Med. Examiners of Calif.* (1948) 32 C.2d 301, 317 (dis. opn. of Traynor, J.); *Lacy v. California Unemp. Ins. App. Bd.* (1971) 17 Cal.App.3d 1128, 1135, fn. 2.)

15

"willfully inflict[ing] upon any child any cruel or inhuman corporal punishment or injury resulting in a traumatic condition."  (Pen. Code, § 11165.4.)

These definitions have been borrowed almost verbatim from the statutes defining two forms of *criminal* child abuse.  Penal Code section 273a makes it a crime to "willfully cause[] or permit[] any child to suffer, or inflict[] thereon unjustifiable physical pain or mental suffering."  (Pen. Code, § 273a, subds. (a), (b).)  Penal Code section 273d, subdivision (a), makes it a crime to "willfully inflict[] upon a child any cruel or inhuman corporal punishment or an injury resulting in a traumatic condition."

It has long been held in prosecutions for these and similar crimes against children that, "a parent has a right to reasonably discipline his or her child and may administer reasonable punishment without being criminally liable."  (*People v. Clark* (2011) 201 Cal.App.4th 235, 249 (*Clark*), citing *People v. Whitehurst* (1992) 9 Cal.App.4th 1045, 1050 (*Whitehurst*); see *People v. Curtiss* (1931) 116 Cal.App.Supp. 771, 775-780 (*Curtiss*); *People v. Stewart* (1961) 188 Cal.App.2d 88, 91.)  A similar privilege is recognized in tort law:  From 1931 to 1971, parents in California possessed a blanket immunity from liability to their children.  (See *Trudell v. Leatherby* (1931) 212 Cal. 678, 680, overruled in *Gibson v. Gibson* (1971) 3 Cal.3d 914, 923.)  Before abolishing that rule entirely, the Supreme Court limited it to negligence cases.  (*Emery v. Emery* (1955) 45 Cal.2d 421, 429-430.)  In doing so the court held that parents' "wide discretion in the performance of . . . parental functions" did not extend to the wilful infliction of injuries "beyond the limits of reasonable parental discipline."  (*Id.* at p. 430.)  Thus parents are privileged to "administer reasonable punishment with impunity," but the parent who "exceeds that limit . . . commits a battery and is civilly liable for the consequences."

16

(*Gillett v. Gillett* (1959) 168 Cal.App.2d 102, 104; 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 28, pp. 88-91; see Rest.2d, Torts, §§ 147-155.)[11]

In criminal cases the privilege is embodied in a pattern instruction informing jurors that the use of "physical force" against a child is justified "if a reasonable person would find that punishment was necessary under the circumstances and that the . . . physical force used . . . was reasonable." (CALCRIM No. 3405; see *id.*, Nos. 821 [in prosecution of parent for child abuse likely to produce great bodily harm or death, state must prove that parent was not "reasonably disciplining a child"], 822 [same, prosecution for criminal infliction of physical punishment on child].)

As the language of the instruction indicates, successful assertion of the privilege requires both a reasonable *occasion* for discipline and a punitive *measure* that is reasonable in *kind and degree*. (See *Clark*, *supra*, 201 Cal.App.4th at p. 250, quoting *Whitehurst*, *supra*, 9 Cal.app.4th at p. 1050 [" 'corporal punishment is unjustifiable when it is . . . not necessary, or when such punishment, although warranted, was excessive' "].) It may also be said that the privilege requires a genuine disciplinary motive, as distinct from "an intent to endanger the health and safety of the child, or to achieve an unlawful purpose." (*People v. Checketts* (1999) 71 Cal.App.4th 1190, 1192 [father properly convicted of false imprisonment where he ordered daughter to remain in attic so that social worker would not see her black eye]; see *People v. Senior* (1993) 3 Cal.App.4th 765, 781 [parent entitled to custody cannot ordinarily commit kidnapping, but "is liable for kidnapping if he or she exercises custodial rights for an illegal purpose"].)

---

[11] In a somewhat similar vein, the dependent child law provides that in the absence of "serious physical injury," the "serious physical harm" that will warrant assertion of juvenile court jurisdiction "does not include reasonable and age-appropriate spanking to the buttocks." (Welf. & Inst. Code, § 300, subd. (a).)

17

Mother invoked this privilege implicitly at the administrative hearing and explicitly in the trial court, citing many of the authorities discussed above for the proposition that parents are entitled to impose reasonable discipline upon their children. She argued as a factual matter that the discipline imposed here was reasonable. Neither the hearing officer nor the trial court acknowledged such an entitlement and neither appeared to give any consideration to the question whether the spanking at issue fell within the zone of reasonable discipline. The first question, then, is whether a parent accused of child abuse for purposes of reporting under CANRA may rely on the same disciplinary privilege that limits a parent's criminal culpability and civil liability. Our study of the statutory text and history of the Act, as well as relevant precedent, compels us to answer this question in the affirmative, at least in the context of the facts presented here.

Foremost of the considerations leading us to this conclusion is the Legislature's explicit acknowledgment of a parental disciplinary prerogative in conjunction with its adoption of CANRA in 1980. In an uncodified statement of intention, the Legislature declared that "the reporting of child abuse and any subsequent action by a child protective agency involves a delicate balance between the right of parents to control and raise their own children by imposing reasonable discipline and the social interest in the protection and safety of the child. Therefore, it is the intent of the Legislature to require the reporting of child abuse which is of a serious nature and is not conduct which constitutes reasonable parental discipline." (Stats. 1980, ch. 1071, § 5, p. 3425.)

This plain expression of intent could end our analysis, but we find additional support for our reading elsewhere as well. First, as already noted, the two forms of child abuse most directly implicated here (Pen. Code, §§ 1165.3, 1165.4) are defined in terms materially identical to those used to define parallel forms of criminal child abuse (Pen. Code, §§ 273a, subds. (a), (b), 273d). "Where a statute is framed in language of an

18

earlier enactment on the same or an analogous subject, and that enactment has been judicially construed, the Legislature is presumed to have adopted that construction."[12] (*People v. Harrison* (1989) 48 Cal.3d 321, 329; *People v. Masbruch* (1996) 13 Cal.4th 1001, 1007; see *Los Angeles County Dependency Attorneys, Inc. v. Department of General Services* (2008) 161 Cal.App.4th 230, 240.) This is a rule of long standing. (See, e.g., *Ex parte Nowak* (1921) 184 Cal. 701, 705-706, disapproved on another point in *Ex parte Trombley* (1948) 31 Cal.2d 801, 804-805; *Union Oil Associates v. Johnson* (1935) 2 Cal.2d 727, 734-735.) It has previously been applied to questions of what constitutes reportable child abuse under CANRA. (See *People ex rel. Eichenberger v. Stockton Pregnancy Control Medical Clinic, Inc.* (1988) 203 Cal.App.3d 225, 234 [by incorporating criminal definition of sexual assault, CANRA made consensual sex between 21-year old and 14-year old reportable; Legislature was "presumed to know the meaning given statutes by the courts"].)

As already noted, courts had recognized disciplinary privilege as a defense to criminal child abuse charges long before CANRA was enacted. The seminal case was a prosecution under Penal Code section 273a involving a teacher whom the court viewed as standing "*in loco parentis*" for purposes of disciplining her pupils. (*Curtiss*, *supra*, 116 Cal.App.Supp. 771, 775.) The privilege was applied to cases of unlawful discipline,

---

[12] As originally adopted in 1980, CANRA did not repeat the definitions of the criminal statutes in haec verba, as it does now, but incorporated them by reference. (See former Pen. Code, § 11165, subd. (g), as adopted by Stats. 1980, ch. 1071, § 4, p. 3421 [defining child abuse to include "any act or omission proscribed by Section 273a (willful cruelty or unjustifiable punishment of a child) or 273d (corporal punishment or injury)"].) The earliest reference to either statute appears in the 1974 amendments to the predecessor statute, which imposed a duty to report when it "appear[ed] . . . that any injury prohibited by the terms of Section 273a has been inflicted upon the minor." (Former Pen. Code, § 11161.5, subd. (a), as amended by Stats. 1974, ch. 348, § 1, p. 680; repealed by Stats.1980, ch. 1071, § 1.) The definitional sections involved here were adopted in more or less their present form in 1987. (Stats. 1987, ch. 1459, §§ 9, 10, p. 5519.)

prosecuted under the predecessor to Penal Code section 273d, in *People v. Stewart*, *supra*, 188 Cal.App.2d 88, 91. (See also *Whitehurst*, *supra*, 9 Cal.App.4th 1045, 1050; *Clark*, *supra*, 201 Cal.App.4th 235, 250.) From this history we may infer that the Legislature intended the disciplinary privilege to inform the definition of at least those forms of reportable child abuse.

Further, the Legislature elected to place CANRA in the Penal Code, specifically in Part IV ("Prevention of Crime and Apprehension of Criminals"), Title One ("Investigation and Control of Crimes and Criminals"), rather than in, say, the Welfare and Institutions Code, the Government Code, or the Health and Safety Code. Its placement in the code governing criminal culpability and prosecution tends to suggest that it was addressed to conduct that was criminal in character. Of course, in construing a code provision, " 'chapter and section headings cannot be resorted to for the purpose of creating ambiguity when none exists.' " (*Woodland Park Management, LLC v. City of East Palo Alto Rent Stabilization Bd.* (2010) 181 Cal.App.4th 915, 924, fn. 5, quoting *City of Berkeley v. Cukierman* (1993) 14 Cal.App.4th 1331, 1340.) But where the intended application of a statute is doubtful, "organization and section headings may properly be considered in determining intent," and may even be " ' "entitled to considerable weight." [Citations.]' " (*Ibid.*, quoting *People v. Hull* (1991) 1 Cal.4th 266, 272.) Here, the placement of CANRA supports an inference that it was aimed at criminal conduct, and that the Legislature expected its application to be guided by at least some of the substantive principles of criminal law. (See *Planned Parenthood Affiliates v. Van de Kamp* (1986) 181 Cal.App.3d 245, 267 [CANRA "contemplate[s] criminal acts of child abuse"].)

We find yet another clue in the text of the original Act. In adopting it the Legislature was required to determine whether it mandated local expenditures that would be subject to subvention—meaning, in essence, reimbursement from state funds. (See

20

Cal. Const., art. 13B, § 6; Gov. Code, § 17561; former Rev. & Tax. Code, §§ 2231, 2234.) The Legislature found that subvention was not required because the Act came within an exemption for enactments "creat[ing] a new crime or infraction, eliminat[ing] a crime or infraction, or chang[ing] the penalty for a crime or infraction." (Stats. 1980, ch. 1071, § 6, p. 3426, citing former Rev. & Tax. Code, §§ 2231, 2234; see Cal.Const., art. 13B, § 6, subd. (a)(2); Gov. Code, § 17556, subd. (g).) While this may not furnish sufficient ground to find the definition of reportable child abuse perfectly congruent with the outlines of pertinent penal statutes, it certainly lends support to the conclusion that well settled principles limiting culpability for criminal child abuse should be consulted in applying parallel provisions of CANRA.[13]

We also recognize that CANRA explicitly exempts three specific categories of conduct, not including parental discipline, from the definition of " 'unlawful corporal punishment or injury.' " (Pen. Code, § 11165.4.)[14] This suggests an occasion to invoke the maxim *expressio unius est exclusio alterius*, under which "the enumeration of things to which a statute applies is presumed to exclude things not mentioned." (*O'Grady v.*

---

[13] Nothing we say should be construed as importing a new rule under which a person accused of child abuse under CANRA may erect as an obstacle any fact or circumstance that might impede criminal conviction for the same conduct. We hold no more than that CANRA must be understood to incorporate the parental privilege of reasonable discipline, at least insofar as it affects the two forms of child abuse at issue here.

[14] "It does not include an amount of force that is reasonable and necessary for a person employed by or engaged in a public school to quell a disturbance threatening physical injury to person or damage to property, for purposes of self-defense, or to obtain possession of weapons or other dangerous objects within the control of the pupil, as authorized by Section 49001 of the Education Code. It also does not include the exercise of the degree of physical control authorized by Section 44807 of the Education Code. It also does not include an injury caused by reasonable and necessary force used by a peace officer acting within the course and scope of his or her employment as a peace officer." (Pen. Code, § 11165.4.)

*Superior Court* (2006) 139 Cal.App.4th 1423, 1443.)  Like  nearly all "rules" of statutory construction, however, this doctrine is most properly viewed as a preference or guideline which must be balanced against other indications of legislative intent, and must yield when they preponderate against it.  (See *Ocean Harbor House Homeowners Ass'n v. California Coastal Com'n* (2008) 163 Cal.App.4th 215, 241-242, quoting *Estate of Banerjee* (1978) 21 Cal.3d 527, 539 [maxim is " 'no magical incantation, nor does it refer to an immutable rule," but "[l]ike all such guidelines, . . . has many exceptions' "]; see *id.* at p. 242, quoting *Burns v. California Fair Plan* (2007) 152 Cal.App.4th 646, 656 [maxim " 'does not apply where its application would run counter to a well-established principal of law' " or where operation " ' " 'would contradict a discernible and contrary legislative intent' " ' "].)  Here, as we have noted, the Legislature expressly declared its intention to preserve the right of parents to physically discipline their children.  The failure to reiterate that intention in defining specific forms of child abuse does not permit us to disregard it.

We conclude that the parental privilege to impose reasonable physical discipline upon a child must be incorporated into CANRA's definitions of what constitutes " 'willful harming or injuring of a child' " (Pen. Code, § 11165.3) and " 'unlawful corporal punishment or injury' " (Pen. Code, § 11165.4).  It follows that Mother's conduct here was not reportable child abuse if it constituted the reasonable imposition of discipline.

### C. Application

The trial court refused to consider whether Mother's conduct constituted reasonable parental discipline.  Instead its statement of decision—written by counsel for the District—erected a straw man in the form of a " 'good intentions' exception" which "the legislature, in its wisdom, has elected not to include."  We agree that there is no

22

"good intentions" defense, as such, to a charge of unlawful discipline.[15] That begs the question posed by Mother, however, which is whether her conduct fell within the privilege of a parent to impose reasonable discipline on his or her child. As we have concluded, a genuine disciplinary intention can furnish a bar to a finding of child abuse under CANRA when the circumstances present a reasonable occasion for discipline and the discipline imposed is reasonable in kind and measure. The trial court did not acknowledge, let alone consider, these principles, despite Mother's explicit assertion of such a right and her citation of several of the relevant authorities. This was error, and it can withstand appellate scrutiny only if we can say that it could not affect the outcome, i.e., that the trial court, applying the principles we have described, *could not find* that Mother's conduct fell within the privilege. We do not believe the record supports such a conclusion.

As we have said, a successful assertion of the parental disciplinary privilege requires three elements: (1) a genuine disciplinary motive; (2) a reasonable occasion for

---

[15] At least this is true in most jurisdictions including California. Something like the rule posited by the trial court once prevailed, and may still prevail, in some jurisdictions. (See *State v. Pendergrass* (1837) 19 N.C. 365 [1837 N.C. LEXIS 42], cited in *Curtiss*, *supra*, 116 Cal.App.Supp. 771, 776 [parent was immune from legal consequences for physical discipline unless it "result[ed] in disfigurement of or permanent injury," or was "inflicted maliciously"]; *Curtiss*, *supra*, at p. 777 [citing additional cases following this approach]; *J.B. v. Department of Public Welfare* (Pa. Commw. Ct. 2003) 824 A.2d 342, 345, citing *Boland v. Leska* (Pa. Super. Ct. 1982) 308 Pa.Super. 169, 176 [454 A.2d 75, 78] ["In Pennsylvania, a parent may use corporal punishment as a means of discipline provided that the parent does not act with malicious intent and there is not a substantial risk of death, disfigurement, serious bodily injury, gross degradation, extreme pain or mental distress."].) The court in *Curtiss* rejected this rule in favor of the "more enlightened view" that neither a severe injury nor a malicious intent is required to establish culpability; rather, "both the reasonableness of, and the necessity for, the punishment [are] to be determined by a jury, under the circumstances of each case." (*Curtiss*, *supra*, at p. 777, citing *Clasen v. Pruhs* (1903) 95 N.W. 640, 642 [69 Neb. 278]; see *id.* at p. 778 [citing additional cases].)

23

discipline; and (3) a disciplinary measure reasonable in kind and degree. Here there is no room for serious debate about the first and second elements. The social worker characterized Mother's actions as born out of "frustrat[ion]," apparently meaning to imply that she was acting irrationally, in desperation. Nothing in the record supports such a view, or otherwise supports a rejection of the parents' and Daughter's consistent reports that the spanking was entirely the product of a genuine and deliberate disciplinary purpose, i.e., to arrest troubling behavior patterns exhibited by Daughter. There was no evidence of any other reason for Mother's actions. The social worker failed to uncover evidence of any more general tendency toward violence in the home. There was no hint of eagerness or self-gratification in the parents' resort to spanking. On the contrary, Mother testified without contradiction that she acted with great reluctance and regret.

Nor does the record suggest any reason to doubt that the circumstances furnished a reasonable occasion for discipline. All family members reported that Daughter's conduct gave great cause for concern over the months preceding the spanking. Academically her grades were declining, she was failing to complete her homework, she was failing to arrive in class on time, and she was making false excuses about these failures. Her attention seemed to be shifting away from school toward less salutary objects; she was becoming "boy crazy" and, worst, showing an unhealthy interest in street gang culture. The parents "had many discussions with [her] about this new crowd, these alarming text messages, and her new lack of responsibility. She would hear us, yet continued to go down this road[.]" They had tried lesser disciplinary measures, but none had produced any lasting effects. After discussing the problem between themselves, the parents concluded that "the only other option out there, would be to try spanking."

The only question presenting any difficulty is whether the measure actually applied—spanking with a wooden spoon, with resulting bruises—was reasonable in kind and degree. To overlook as harmless the trial court's failure to entertain the reasonable

24

discipline privilege, it would have to appear as a matter of law either that a wooden spoon was an unreasonable means to administer the spanking, or that it was applied with excessive force.

We cannot say that the use of a wooden spoon to administer a spanking necessarily exceeds the bounds of reasonable parental discipline. Although no published California decision addresses this issue, the Attorney General has concluded that "[i]t is not unlawful for a parent to spank a child for disciplinary purposes with an object other than the hand," provided that "the punishment [is] necessary and not excessive in relation to the individual circumstances." (80 Ops.Cal.Atty.Gen. 203, 204 (1997); see *In re Adam D.* (2010) 183 Cal.App.4th 1250, 1254, 1257 [trial court found only "age appropriate spanking," where mother admitted using hand and belt]; cf. *In re Jasmine G.* (2000) 82 Cal.App.4th 282, 291 [dictum that hitting child with belt and switch "crossed the line over into abuse"].) Opinions from other jurisdictions preponderate to similar effect. (See, e.g., *In Interest of J.P.* (1998) 294 Ill.App.3d 991, 1005 [692 N.E.2d 338, 346] [reversing finding of child abuse based on repeated spankings with wooden spoon; "the use of an object . . . should not blind a court to the many other factors which should and must be considered when weighing the evidence to determine the 'reasonableness' of the discipline"]; *Johnson v. Smith* (Minn. Ct. App. 1985) 374 N.W.2d 317, 320 [evidence, including spanking with wooden spoon, did not sustain finding that child's health or development was endangered, where there was no evidence of injury or that child was fearful of mother].)

Nor do we think that the infliction of visible bruises automatically requires a finding that the limits of reasonable discipline were exceeded. Certainly the presence of lasting bruises or other marks may support a finding that a parent crossed the line between permissible discipline and reportable abuse. (*Brown v. Department of Social Services* (2006) 66 Mass.App.Ct. 1103 [845 N.E.2d 1223], citing *Cobble v.*

25

*Commissioner of the Dept. of Social Servs.* (1999) 430 Mass. 385, 393 [719 N.E.2d 500, 507] [temporary redness reported by child did not satisfy state's threshold of "substantial risk of harm"; "evidence that soft tissue swelling or skin bruising occurred or is likely to occur is necessary"]; see also *State v. Allen* (Me. 2006) 892 A.2d 456, 460 [in battery prosecution, photographs of bruises were pertinent to parental discipline defense because they showed that "it was more probable than not that the marks were not temporary"]; *G.A.C. v. State ex rel. Juvenile Department of Polk County* (Or. Ct. App. 2008) 219 Or.App. 1, 13 [182 P.3d 223, 229] [striking child on arms with wooden spoon was abuse, not reasonable discipline, where it "caused substantial welts, bruising, and pain"].) However, such effects alone do not compel a finding of child abuse. (See *Hildreth v. Iowa Dept. of Human Services* (Iowa 1996) 550 N.W.2d 157, 160 [divided court reverses finding of abuse where, in view of "marginal nature" of red marks on daughter's buttocks and their disappearance within a few days, father "could not reasonably have foreseen" that spanking with spoon "would produce a physical injury"]; *Raboin v. North Dakota Dept. of Human Services* (N.D. 1996) 552 N.W.2d 329, 335 [under statute defining reportable child abuse to include "a serious 'negative change[] in a child's health,' " no child abuse occurred in measured spankings with a plastic spoon, even assuming some "slight bruising"].)

It has been suggested that the reasonableness of a given instance of corporal punishment "depends on four factors:  the age of the child, the part of the body that was struck, the instrument used to strike the child, and the amount of damage inflicted." (Meriwether, Child Abuse Reporting Laws: Time for a Change (1986) 20 Fam. L.Q. 141, 157, fn. omitted, citing Fraser, *A Glance at the Past, A Gaze at the Present, A Glimpse at the Future: A Critical Analysis of the Development of Child Abuse Reporting Statutes* (1978) 54 Chi.-Kent. L. Rev. 641, 652, fn. 62.)  We believe that visible bruising demarcates, or at least very nearly approaches, the outer limit for the quantum of

26

"damage" to be tolerated. However, we do not believe that it necessarily compels a finding of abuse unless there are grounds to find that the parent intended to inflict bruises, knew his or her conduct would do so, or should have known that bruises were likely to result from the amount of force applied and the method of its application.

We see no reason to believe that this test is satisfied here. Nothing in the record suggests that Mother should have known she was inflicting bruises. As one court said, "The laws of physics are such that when even a moderate degree of force is administered through an instrument that makes contact with only a small area of the body, the pressure visited upon that point may be more than will reasonably be anticipated." (*Hildreth v. Iowa Dept. of Human Services*, *supra*, 550 N.W.2d 157, 160.) The evidence was in conflict as to whether Daughter had ever been spanked with a wooden spoon before, but assuming she had, there was no evidence that she had ever sustained visible bruises from it. Nor was there any basis to find that Mother would have been aware of any such bruising if it occurred. According to the family, the spankings were always administered on the child's fully clothed bottom. There was no suggestion of any occasion on which either parent might have observed bruising. It is true that, according to the social worker, Daughter said this particular spanking had been administered on her bare bottom. But even accepting that version of events, it does not follow that Mother knew the spanking was producing, or would produce bruises. Moreover, the family members denied this version of events with such consistency and vehemence that we question whether the social worker's version would or could be credited in a properly conducted hearing. (See pt. II, *post*.)

Under CANRA, a report of child abuse is " '[u]nfounded' " if it "involve[s] an accidental injury." (Pen. Code, § 11165.12, subd. (a).) "In its plain and ordinary sense, 'accidental' means 'arising from extrinsic causes; occurring unexpectedly or by chance[; or] *happening without intent or through carelessness*.' " (*St. Paul Fire & Marine Ins.*

27

*Co. v. Superior* Court (1984) 161 Cal.App.3d 1199, 1202, italics added.) There can be no doubt that Mother's *conduct*—striking her Daughter's buttocks with a wooden spoon—was intentional. The resulting bruises, however—the only "injury" even arguably involved—appear to have been "accidental" in that they "happen[ed] without intent," and at most "through carelessness."[16] In such circumstances, at least, the fact that a spanking resulted in bruises cannot be enough by itself to sustain a finding that the spanking amounted to reportable child abuse.[17]

It follows that the trial court erred in categorically rejecting Mother's assertion that the conduct reported as child abuse constituted a reasonable attempt to discipline her child. The court acted on the ground not that the assertion of a disciplinary right was unsupported by the facts, but that such a purpose was categorically irrelevant. The

---

[16] CANRA originally defined " '[c]hild abuse' " to include "a physical injury which is inflicted by other than accidental means on a child by another person." (Former Pen. Code, § 11165, subd. (g), enacted by Stats. 1980, ch. 1071, § 4, p. 3421; repealed by Stats. 1987, ch. 1459, § 1, p. 5517.) This phrase describes a substantially narrower range of circumstances than "accidental injury." For example, the application of reasonable force during an arrest might conceivably result in a broken arm; the injury itself might well be "accidental" even though the means by which it was suffered—the deliberate application of force—was not. Even under the prior formula, however, the Attorney General opined that injuries caused by reasonable force during a lawful arrest could not be viewed as reportable child abuse. (70 Ops.Cal.Atty.Gen. 38.) The opinion rested largely on the broad statement of legislative intent to which we have previously alluded. That statement makes no specific reference to police officers, but it explicitly preserves the right of parents to impose reasonable discipline. The definition of "accidental injury," as applicable to cases of parental discipline, should also be informed by that expressed intention.

[17] In its petition for rehearing, the Department accuses us of injecting a new element into child abuse cases by "making the applicability of the parental privilege dependent on the mental state of the parent . . . ." All we have said is that where the only indication of excessive discipline is visible bruising on a child's buttocks, the fact that the bruising was inadvertent will support a finding that the parents' conduct fell within the privilege to impose reasonable discipline.

28

hearing officer appeared to adopt the same approach, which explains in part his apparent willingness to exclude the testimony of Mother's most important witness, the victim of the reported child abuse. (See pt. II, *post*.) If the report before us is to be held substantiated over Mother's challenge, it must be upon the basis of a reasoned finding, supported by substantial evidence, that the spanking did not constitute reasonable discipline. The matter must therefore be returned to the Department with instructions either to conduct a new hearing at which that issue is addressed, or to modify its decision to find the report unfounded and to notify the Department of Justice that the report must be expunged from CACI.

## II. Exclusion of Daughter's Testimony

### A. Proceedings Below

Mother contends that the hearing officer abused his discretion and denied her a fair hearing by preventing Daughter from testifying. This contention is sound. Early in the hearing Mother expressed the intention to call Daughter as a witness. After determining that Daughter was then 13 years old, the officer told Mother that he "ha[d] the option" of preventing Daughter from testifying and that he might well do so because he was "not sure that her testimony will really inform my decision anymore than what is in the record and what's not in the record."

The issue arose again after Mother completed her testimony. At that time the hearing officer said that he was not inclined to allow Daughter to testify, suggesting that it would be "pretty traumatic" and that her testimony would be superfluous in view of Mother's submission of her declaration. Counsel for the Department asked to "see [Daughter's] report," apparently meaning the declaration. The hearing officer declared a break. Afterwards, an attendee described only as "Ronni Smith with DFCS Administration"—apparently the Department's assigned lay representative at the hearing—told the hearing officer, "[Daughter] is very eager and wanted to talk to you.

29

She stopped me in the hall . . . ." The officer did not respond to this information. In his recommendation and summary of findings he described himself as having ruled during the hearing that "I would not allow [Daughter] to testify as we had her declaration and that it would be traumatic for [her] to testify. I said that I would accept her declaration as her testimony (Complainant Exhibit 2)."

In her petition for administrative mandate, Mother asserted this ruling as a basis for relief. The trial court concluded that the hearing officer had not abused his discretion by preventing Daughter from testifying.

### B. *Standard of Review*

The statute governing judicial review of adjudicatory administrative proceedings identifies three areas into which the court may inquire: "whether the [agency] has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (Code Civ. Proc., § 1094.5, subd. (b).) The last may be found where the agency "has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*)

The statute's requirement of a " 'fair trial' " means that there must have been "a fair administrative hearing." (*Pomona College v. Superior Court* (1996) 45 Cal.App.4th 1716, 1730, citing *Guilbert v. Regents of University of California* (1979) 93 Cal.App.3d 233, 241.) "A challenge to the procedural fairness of the administrative hearing is reviewed de novo on appeal because the ultimate determination of procedural fairness amounts to a question of law." (*Nasha L.L.C. v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 482; see *Anserv Insurance Services, Inc. v. Kelso* (2000) 83 Cal.App.4th 197, 205; *Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1169-1170; *Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434, 1443-1444;

30

*Duncan v. Department of Personnel Admin.* (2000) 77 Cal.App.4th 1166, 1174; *Lewin v. St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 387.)

However, insofar as the agency relied on findings of fact—as the officer did here to the extent he found that testifying would be traumatic for Daughter—the finding "must be upheld so long as it is supported by substantial evidence." (*People v. Franzen* (2012) 210 Cal.App.4th 1193, 1205; see Evid.Code, § 400 et seq.; 3 Witkin, Cal. Evidence (5th ed. 2012) Presentation at Trial, §§ 60, 61, 75, pp. 109-111, 124-125.)

The questions thus presented are (1) whether the officer denied Mother a fair hearing by preventing Daughter from testifying, and (2) whether the record contains substantial evidence to sustain a finding of trauma, or other ground sufficient to justify the exclusion of her testimony.

### C. Good Cause

There is no evidence in this record that Daughter would have suffered distress of any kind or degree—let alone "trauma"—from testifying at the hearing. The only evidence before the hearing officer was to the opposite effect. The representative of the Department at the hearing told the officer that she had encountered Daughter outside the hearing room and that Daughter was "very eager" to talk to him.

Echoing the Department's memorandum in opposition to the writ petition, the trial court's statement of decision suggests that it would have been inherently traumatic for Daughter to "sit next to her mother and tell a group of strangers that her mother had hit her." This is sheer speculation; nothing in the record suggests that Daughter would have found such an experience traumatic, particularly after the humiliations to which she had already been subjected in the course of the Department's investigation. Again, the only evidence before the hearing officer on this subject was Daughter's own statement to the

31

Department's representative that she was "very eager" to tell her story. The trauma asserted by the Department, and found by the trial court, appears entirely imaginary.[18]

We recognize that at the time of the hearing Daughter was 13, and that this is a tender age by most reckonings. But children far younger than 13 have testified in countless cases about experiences far worse than anything here. As the manual governing hearings of this kind states parties to such proceedings are generally entitled to "call witnesses to the hearing and question the witnesses called by the other party." (Calif. Department of Social Services Health & Human Services Agency, Manual of Policies and Procedures [for] Child Welfare Services, § 31-021.66, p. 24.4 (effective 9/3/10) (CWS Policy Manual).)[19] The manual contains specific provisions for dealing with the testimony of children in such matters. It provides, first, that the hearing officer "may prevent the presence and/or examination of a child at the grievance hearing for *good cause*, including but not limited to protecting the child from trauma or to protect his or her health, safety, and/or well-being." (CWS Policy Manual, *supra*, § 31-021.662, p. 24.4; italics added.) It then provides that a child may testify only if the hearing officer finds that his or her "participation in the grievance hearing is voluntary and the child is capable of providing voluntary consent." (*Id*., § 31-021.663, p. 24.4.) It invites the hearing officer to "interview the child outside the presence of county staff, complainant

---

[18] In its petition for rehearing, the Department asserts that trauma could be inferred from the contradictions between Daughter's supposed statements to the social worker and the contrary statements in her declaration—the suggestion being, apparently, that the latter were the product of undue influence by her parents, against whose wishes she would have been compelled to testify truthfully. This entire construct presupposes that the social worker had accurately reported Daughter's statements to her—a premise cast in serious doubt at many points in the record. The hearing officer could not fairly resolve these conflicts in the evidence while refusing, without substantial cause, to hear from the only percipient witness other than the social worker.

[19] Available at <http://www.cdss.ca.gov/ord/entres/getinfo/pdf/cws1.PDF> (as of Jan. 8, 2014).

and/or any other party in order to determine whether the participation of the child is voluntary, or whether good cause exists for preventing the child from being present or testifying at the grievance hearing." (*Id.*, § 31-021.663(a), p. 24.4.)

In other words, before admitting or excluding the testimony of a child the hearing officer must determine whether the child is capable of consenting, does consent, and would be testifying of his or her own volition. If those questions are answered in the affirmative, the hearing officer must decide whether there is "good cause" to prevent the child from testifying. This may require the officer to "interview the child." Here the presiding officer made no effort whatever to determine whether there was "good cause" to exclude Daughter's testimony. He appeared to believe himself vested with unregulated discretion to exclude her testimony or that of any child whom Mother, or anyone else in her position, might seek to call as a witness. In this he was mistaken. In the absence of some particularized reason to conclude otherwise, Mother was entitled to present relevant evidence in support of her challenge to the Department's findings. This most definitely included the testimony of her "very eager" daughter. The exclusion of that testimony without a finding of good cause, and without any evidentiary basis on which such a finding might have been able to rest, rendered the proceeding fundamentally unfair.

### D. *Materiality*

Both the hearing officer and the trial court seemed to conclude that, apart from any supposed traumatic effect, Daughter's testimony could be dispensed with as immaterial, or at least superfluous. Two grounds for such a conclusion were suggested. The first is that given the undisputed facts, nothing Daughter could have said would have cast any legal doubt on the conclusion that Mother's conduct amounted to reportable child abuse. The Department defends this suggestion only in passing, stating, "because the only issue in this case is whether the spanking that [Daughter] received from the mother constituted

33

'unlawful corporal punishment or injury' under Penal Code section 11165.4, having [Daughter] testify about what she did or did not say to the social worker at school on April 30, 2010, would have served no useful purpose." This of course ignores the question of whether the spanking was privileged as a reasonable imposition of parental discipline. The reasonableness of the spanking in turn may have depended on such questions as whether the spoon was applied to bare skin, as the social worker said Daughter had told her, or whether Daughter was fully clothed, as she and three other family members emphatically insisted. The hearing officer could not fairly resolve this or the many other similar conflicts in the evidence without hearing Daughter's own testimony.

This brings us to the second suggestion of superfluity, which flows from the hearing officer's expressed willingness to receive Daughter's declaration in lieu of her testifying on the stand. The short answer to this suggestion is that declarations are no substitute for live testimony, particularly in a case presenting sharp conflicts between the parties' versions of events. Here the Department relied entirely on the social worker's report and live testimony, both of which consisted largely of statements attributed to Daughter. Daughter emphatically denied saying many of the things thus attributed to her. If the hearing officer had credited those written denials, there might be a sound basis for deeming her live testimony superfluous. But there is no evidence that he credited them, and indeed all indications are to the contrary—that insofar as she denied matters attributed to her by the social worker, the hearing officer accepted the latter's account as true. Thus, for all this record shows, the finding of child abuse rested upon such controverted facts as the administration of the spanking to bare skin, Daughter's supposed fear of going home, Mother's resort to the spoon because it "hurt more," and so on. (See also pt. III, *post*.)

34

It verges on a kind of juridical fraud to tell a party that proffered testimony is unnecessary and then, in its absence, to lend full credence to the version of events it would have tended to controvert. If the hearing officer intended to resolve his doubts against the veracity of Daughter's direct averments, and to credit instead hearsay statements attributed to her by another witness, he could not fairly conclude that her live testimony would have added nothing. Before disbelieving her, he owed it to her—and to her mother, upon whom he intended to fasten a lifetime stigma as a child abuser—to see and hear her recount her version of events.

The exclusion of Daughter's testimony cannot be justified on the ground that it would be immaterial or redundant. Given the entire absence of evidence on which a finding of good cause might rest, that exclusion must be held an abuse of discretion.

### III.    *Hearing Officer's Misapprehension of Powers*

Although the point is not raised by Mother, the record raises another serious concern which we mention for the guidance of the Department should this matter be heard again. Early in the hearing, in discussing the issues presented, Mother stated, "I do not feel that I abuse my daughter, this was not a case of child abuse." In response, the officer stated as follows: "Okay, I say these [*sic*] probably 10 times today [*sic*], so bare [*sic*] with me. All I can deal with, all this hearing is about is whether the County properly made the decision to submit your name to DOJ." Later, when Father expressed consternation over the school's conduct in the matter, the hearing officer disclaimed any power not only over the school but also over "the county" and "some of the things in the record that you would like to dispute." He added, "[I]f you want to question the records with the county again I do not have any jurisdiction over that whatsoever and you can talk to the county about how that what your concerns are and I do not know what they will do to be honest, but you need to deal with them directly. I do not want you to think that I *can handle that because I do not so . . . .*"

35

In his findings and recommendations, the hearing officer recounted the above exchange with Mother as follows: "[Mother] stated that some of what was in the report was not accurate and that the school should not have reported. I advised [Mother] that this hearing was to determine if the referral had appropriately been sent to the Department of Justice and listed on the CACI; and that she should follow up with the school and Social Services Agency if she has concerns about other parts of the investigation."

Although the foregoing remarks are marked by the vagueness that pervades much of the record of the hearing, they appear to suggest some belief on the part of the hearing officer that he had little if any power to question the veracity of evidence relied on by the social worker in finding the report to be substantiated. If he indeed entertained such a belief, he was grossly mistaken. Two years before the hearing, CANRA had been held to violate due process, basically for failing to provide adequate "procedural safeguards" to permit effective challenge of an investigator's initial finding that a report of child abuse had been substantiated. (*Humphries v. City of Los Angeles* (9th Cir. 2008) 554 F.3d 1170, 1192, 1200-1201, reversed on other grounds in *Los Angeles County v. Humphries* (2010) 562 U.S. ___, ___ [131 S.Ct. 447, 454].) Another court had construed the Act as impliedly providing a right of administrative review—implicitly recognizing, no doubt, that in the absence of such procedures it would offend due process. (*Burt v. County of Orange* (2004) 120 Cal.App.4th 273, 285 [in response to due process argument, construing act to "impliedly recognize that a person named as a suspected child abuser is entitled to present a timely challenge to a previously filed report and must be given a reasonable opportunity to rebut the charge"].) The Legislature did not address this problem until 2011, when it amended the Act to expressly grant the reported abuser a right to challenge administratively the initial decision to submit a report for inclusion in CACI. (Pen. Code, § 11169, subd. (d), adopted by Stats. 2011, ch. 468, § 2; see Sen.

36

Rules Com., Off. of Sen. Floor Analysis, 3d reading analysis of Assem. Bill 717 (2011-2012 Reg. Sess.), as amended Aug. 30, 2011, pp. 6-7, <http://www.leginfo.ca.gov/pub/11-12/bill/asm/ab_0701-0750/ab_717_cfa_20110830_101758_sen_floor.html> (as of Jan. 8, 2014).)  Although the amendment had not yet taken effect when the hearing below took place, state child welfare authorities had adopted specific procedures for administrative review.[20]  These required the hearing officer to "make a determination based upon the evidence presented at the grievance hearing, whether the allegation of child abuse and/or neglect is [unfounded, inconclusive, or] substantiated."  (Calif. Department of Social Services Health & Human Services Agency, Manual of Policies and Procedures [for] Child Welfare Services, former § 31-021.81, p. 24.5 (effective 9/31/10), as promulgated in Errata for Manual Letter No. CWS 10-01 (Jan. 11, 2011).)

These procedures manifestly imposed upon the hearing officer not only the power but the duty to evaluate the evidence before him and decide whether the report was substantiated, quite independently of the decision reached by the investigating social worker.  Insofar as he failed to perform that duty, he defeated the whole purpose of the proceeding.  Administrative review which is impotent to overturn erroneous findings is not a safeguard; it is a charade.  Should this matter be heard by the Department again, the presiding officer must weigh and consider the evidence and reach an independent determination whether the facts establish child abuse as distinct from reasonable parental discipline.

---

**20**  These were apparently the product of a settlement agreement between state child welfare authorities and persons challenging CANRA for lack of adequate safeguards.  (See Settlement Agreement and Order, filed Oct. 3, 2007, in Gomez v. Saenz, Los Angeles Superior Ct., No. BC284896, <http://bayareaacademy.org/wp-content/uploads/2013/03/Superior-Court-Doc-Gomez-Settle-Agreement.pdf> (as of Jan.8, 2014).)

*IV.* *Missing Record*

Mother also complains that the Department failed to comply with its obligation to provide a complete record of the "grievance" hearing because, as it conceded, the recording of the last part of the hearing was lost. The Department insists that the error was harmless because the missing portion contained only the arguments of the parties. Mother suggests that the missing record would show some cross-examination of the social worker by Mother. We can find no competent record support for Mother's characterization. We need not delve into the matter, however, for our disposition will ensure that Mother receives either a new hearing or the expungement of the challenged report from CACI. This renders moot the question whether the loss of the recording warrants any relief in its own right.

**DISPOSITION**

The judgment denying the petition for administrative mandamus is reversed and the court is directed to issue the requested writ, commanding the Department to either conduct a new hearing on the matter or to issue a decision finding the report in question unfounded and to notify the state Department of Justice of that finding.

38

_____
                          RUSHING, P.J.

WE CONCUR:

_____
            PREMO, J.

_____
            ELIA, J.

39

Trial Court: Santa Clara County Superior Court
Superior Court No.: CV204141

Trial Judge: The Honorable
Mark H. Pierce

Attorneys for Plaintiff and Appellant       Law Office of Gradstein & Gorman
Veronica Gonzalez:                          Seth F. Gorman

Attorneys for Defendants and Respondents    Lori E. Pegg,
Santa Clara County Department of Social      Acting County Counsel
Services et al.:
                                            Harrison D. Taylor,
                                            Deputy County Counsel