Filed 11/4/21  In re A.S. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re A.S., a Person Coming Under the Juvenile Court Law. | B310778 |
| _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20CCJP03335A) |
| Plaintiff and Respondent, | |
| v. | |
| I.S., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Sabina A. Helton, Judge.  Affirmed.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephanie Jo Reagan, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

A father appeals from the juvenile court's jurisdictional and disposition orders regarding his son A.S.  We affirm.  Undesignated statutory references are to the Welfare and Institutions Code.

I

We recount the factual and procedural background.

The father and mother separated in 2017 and divorced in November 2019 when A.S. was eight.  The divorce was contentious.  The mother claims the father physically and emotionally abused her during the marriage.  The two share custody of A.S.  A.S. spends every other weekend, Monday afternoons, and Tuesday afternoons to Wednesday mornings with his father.  He spends the rest of the time with his mother, with holidays divided between the parents pursuant to a family law order.

A.S. is a high-functioning autistic child.  He received regional center services in the past.  He attends therapy, which he began after the parents' separation.  A.S. is bright and articulate for his age and diagnosis.  He engages in behaviors typical for children with autism, including "stimming" behaviors.  Stimming behaviors are repetitive actions, such as pacing, used to self-soothe and cope with feelings of anxiety, fear, and nervousness.  A.S. has a strong need for structure.  Uncertainty causes him anxiety.

According to his mother, A.S. returned from a weekend visit with his father in June 2020 and told her his father had

choked him and held him on the ground.  A.S. also said his father and paternal grandmother had wanted A.S. to try on pants with suspenders.  A.S. did not want to and began a tantrum, saying he hated his father.  According to A.S., his father then "held me tight and then choked my neck on the ground."  A.S. reported that he defecated on himself because his father's conduct scared him.  His mother found three bruises on A.S.'s side and chest.

The mother set up a virtual therapy session for A.S. with his therapist that afternoon.  A.S. repeated the same account to his therapist.  The therapist recommended the mother report the situation to the police, which the mother did.  The Department of Children and Family Services contacted the mother, and a social worker visited her and A.S. the next day.

During a private interview with the social worker, A.S. repeated his account of the incident and demonstrated how his father held him with his hands.  The social worker observed two thumb-sized bruises on A.S.'s side that A.S. said his father caused when he squeezed and choked A.S. over the weekend.  A.S. told the social worker his father threw an apple at his mother before and had twisted A.S.'s arm.  A.S. refused to go to his father's for his scheduled visit that day.

The social worker spoke with the father about the incident.  The father said, when A.S. began to throw a fit about the suspenders, the father "gave [A.S.] a tight hug and told him I love him."  A.S. told his father, "No, stop."  The father denied holding A.S. down or putting his hands on A.S.'s neck.  The paternal grandmother, who was present, also said the father only "held" A.S. and did not choke him.  The social worker "was surprised by the lack of knowledge the father has about Autistic children in general."

The social worker visited A.S. before A.S.'s next scheduled visit with the father. A.S. paced during their entire 30-minute discussion. A.S. said he did not want to go to his father's and that he was "unsafe because my dad choked me the last time I saw him." After observing A.S.'s level of anxiety, the social worker told the father A.S. did not feel safe to visit that day.

A.S.'s therapist told the social worker A.S. had clearly and consistently described to her how his father choked him. A.S.'s stimming behaviors had also increased over the past few weeks. The therapist did not believe A.S. was physically or emotionally safe in the father's home.

The Department had received previous referrals involving the family. These referrals involved domestic abuse between the parents in front of A.S., an altercation between the father and maternal grandparents during a pickup from a visit, and an incident in which the father pushed a dog crate into the mother. All were closed as inconclusive or unfounded.

The father agreed to a detention and was willing to participate in services. After a hearing, the juvenile court denied the Department's request to detain A.S. from the father, finding A.S.'s account "difficult to believe" because of A.S.'s age and diagnosis. The Department filed a petition for an extraordinary writ. This court stayed the juvenile court's order and granted the writ. We ordered the juvenile court to vacate the order denying the request and reconsider the request consistent with the alternative writ or show cause why it had not done so. The Department filed a peremptory challenge and the court reassigned the case to a different judicial officer. The juvenile court issued an order detaining A.S. from his father.

4

Several weeks after the choking incident and before the adjudication and disposition hearing, the social worker spoke with A.S., who again confirmed his earlier account. He repeated he was afraid of his father, did not want to visit him, and had nightmares about his father.

About five weeks after the incident, A.S.'s doctor prescribed medication to help treat his obsessive-compulsive disorder, his anxiety, and his loss of appetite. A.S.'s therapist wrote a letter detailing A.S.'s increased anxiety since resuming visits with his father. This letter described the effects on A.S.'s physical and mental well-being: more need for routine, trouble sleeping, tantrums, increased stimming, loss of appetite, and consequently heightened levels of medication.

The father had sporadic monitored visits after the Department detained A.S. Before one visit, the social worker overheard the mother telling A.S., "I know you don't want to but you have to until 730 on the dot." A.S. was negative throughout the visit and engaged with the father little. Overall, the social worker reported the visits went very well and the father and A.S. seemed closely bonded. The father did not begin counseling or classes.

The juvenile court held the adjudication and disposition hearing over multiple days. The father called a social worker who worked with the family before. She had concluded in an earlier investigation that the mother might be unintentionally coaching A.S. The father testified about the choking incident and his relationship with A.S. The father again stated he had tried to calm A.S. down by hugging him and demonstrated his action for the court. The court noted it looked as though the father had given A.S. a sort of bear hug. The father said A.S. often said he

was choking when hugged by his father or other relatives. The father testified A.S. had had an accident before the incident, and the accident is what led to A.S. needing to change pants. When asked why he had previously told the social worker A.S.'s accident had been 15 to 20 minutes after and unrelated to the tantrum, the father said he must have been in shock and misspoke. He stated the mother repeatedly made false claims against him and interfered with his ability to see A.S.

The juvenile court sustained an allegation of failure to protect against the father pursuant to section 300, subdivision (b), amending the language in the petition to reflect that the father used "inappropriate physical discipline," rather than engaged in physical abuse of A.S. The court noted it was unclear exactly what occurred, but the court believed it amounted to inappropriate physical discipline and represented "a disconnect on father's part about discipline and parenting a child with [A.S.]'s unique issues." The court noted "a lack of understanding by father of [A.S.]'s exact diagnosis," though the father's love of and pride in A.S. was very apparent. The court noted A.S. was currently having "very serious reactions," including increased anxiety, trouble sleeping, nonstop pacing, and difficulty eating. The court believed the father needed assistance safely to mend his relationship with A.S. without causing further trauma. Based on A.S.'s current mental and emotional state, the court detained A.S. from the father, placed A.S. with the mother, and ordered services for both parents.

The father appealed.

## II

The father argues the record does not contain substantial evidence supporting either the juvenile court's jurisdiction or disposition findings.  We affirm.

### A

The father argues substantial evidence did not support the juvenile court's assertion of jurisdiction over A.S.  This argument is incorrect.

We review the juvenile court's exercise of jurisdiction for substantial evidence.

The father's main argument is he did not cause A.S. serious physical harm with his "bear hug."  The record belies the father's attempts to minimize the effect of his conduct on A.S.  A.S. repeatedly and consistently reported that his father choked him.  Two and three days later, A.S. bore thumb-size bruises.  The father's actions also caused A.S. to defecate on himself from fright.  Although the father testified this was not true, his accounts of the accident were contradictory.  A.S. repeatedly stated he did not feel safe around his father and was worried he would be choked again.  The juvenile court noted after the event A.S. experienced "very serious reactions," including trouble sleeping, difficulty eating, and increased stimming behaviors.  He had begun taking medication and seeing a psychiatrist.  The father's actions constitute serious physical harm to A.S., particularly taking into account A.S.'s diagnosis.

The father cites cases finding parents' use of corporal punishment did not amount to child abuse.  These cases do not concern a child with autism.  Each emphasizes the case-specific nature of such an inquiry.  Here, the court found the father's discipline of A.S. was inappropriate under the circumstances.

7

*Gonzales v. Santa Clara County Department of Social Services*
(2014) 223 Cal.App.4th 72, 92–93 notes that discipline leaving a
bruise does not *automatically* cross the line to unreasonable
punishment, but certainly the presence of lasting bruises may
support a finding that a parent crossed the line between
permissible discipline and reportable abuse.  This holding
supports the juvenile court's ruling.

The father emphasizes the juvenile court's recognition that
he clearly loves and is proud of A.S.  These facts do not contradict
a finding that he engaged in inappropriate conduct that caused
A.S. serious harm.  The court also noted the father's "lack of
understanding . . . of [A.S.]'s exact diagnosis."  This is consistent
with the social worker's observation that the father seemed to
lack general knowledge about children with autism.  Loving your
child does not spontaneously give insight into the specialized care
children with autism require.

The father argues that, even if he did cause A.S. serious
harm, there was not substantial evidence A.S. remained at
substantial risk of harm.  The father's lack of awareness of how
to deal with children with autism did provide this evidence.  The
father had reportedly sought some training about how to deal
with A.S., but still engaged in inappropriate discipline.  The
father admitted he knew A.S. disliked and reacted poorly to being
hugged but persisted in the conduct.  The father did not have the
knowledge or skills to react appropriately.  Thus, until the father
received additional training, there was a risk another such
situation might arise and the father would be ill-equipped to
handle it.  The court noted the "father is going to need assistance
in safely mending this relationship with [A.S.] without causing
further trauma to him."

The father's actions toward A.S. caused A.S. serious physical harm and the father's lack of progress in learning new skills meant A.S. would continue to be at risk with him. Substantial evidence supported the juvenile court's exercise of jurisdiction.

B

The father argues the evidence in the record did not meet the higher clear and convincing standard applied at the dispositional phase. This argument is erroneous.

We review the juvenile court's dispositional order for substantial evidence. Our inquiry is whether the record contains substantial evidence from which a reasonable fact finder could conclude it is highly probable a fact is true. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

A child can be removed from a parent only when failure to do so will result in substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child. (§ 361, subd. (c)(1).) The father focuses on the higher burden posed by the clear and convincing standard at the dispositional stage, but largely ignores the broader focus on the child's emotional well-being.

The juvenile court found A.S. was experiencing a serious reaction to the event with the father. This was taking a toll on A.S.'s emotional and mental well-being, in addition to the physical effects we already have discussed. In considering the disposition, the juvenile court expressly relied on A.S.'s emotional and mental state. This included his nightmares relating to his father, increased stimming behaviors, and the recent need to see a psychiatrist and begin medication. A.S. had also expressed fear of his father and said he did not feel safe. This evidence supports

9

a finding that it is highly probable A.S.'s emotional well-being would be in substantial danger if the court did not remove him from his father.

The father focuses on the notes from a few monitored visits with A.S. stating the visits went well and the two seemed bonded. These positive but limited interactions do not negate A.S.'s substantial negative experiences. Nor do they prove the visits would remain positive without a monitor or for a longer duration.

The father also argues there were reasonable means short of removing A.S. to protect him. He suggests several alternatives: complying with his case plan; making A.S. available for services; unannounced home visits; supervision by the Department and the court; continued cooperation with social workers; in home services; or wraparound services. As the juvenile court noted, however, these measures all would take time, and A.S.'s adverse reaction was right then. The court found the father needed assistance in repairing his relationship with A.S. without causing further trauma. It was reasonable for the court to find returning A.S. to the father, before he had a chance to learn new skills and to demonstrate his mastery of them, would put A.S. at risk. Substantial evidence supported the court's conclusion that clear and convincing evidence showed the measures suggested by the father would not adequately protect A.S.'s well-being given his current state.

## DISPOSITION

We affirm.

WILEY, J.

We concur:

GRIMES, Acting P. J.

OHTA, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.